BETH ISRAEL HOSPITAL ASSOCIATION & others[1] *vs.* BOARD OF
REGISTRATION IN MEDICINE.

Suffolk.  September 14, 1987. — November 23, 1987.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & LYNCH, JJ.

*Department of Public Health. Board of Registration in Medicine. Hospital,*
Peer review. *Health Care Facility. Privileged Communication. Medical
Malpractice,* Hospital. *Administrative Law,* Regulations, Agency.

Statement of principles establishing the standard of judicial review applicable
    to regulations adopted by an administrative agency. [176-177]
In an action under G. L. c. 30A, § 7, and c. 231A, by hospitals challenging
    the authority of the Board of Registration in Medicine to issue certain
    regulations and the consistency of those regulations with St. 1986, c. 351,
    and other statutes, there was no merit to the plaintiffs' contention that
    243 Code Mass. Regs. § 3.07 (3) (a) (1987), which places an "affirmative
    duty" on each health care provider to report "injuries and incidents" to
    the patient care assessment coordinator of the health care facility con-
    cerned, was invalid in that its requirements went beyond those of G. L.
    c. 111, § 203(*a*), or in that it created new duties and might affect
    employment relationships. [177-178]
Regulations of the Board of Registration in Medicine, 243 Code Mass.
    Regs. § 3.08 and § 3.07 (3) (l) (1987), requiring, respectively, that
    hospitals report specified "Major Incidents" to the board and establish
    a system to provide "a reasonable and comprehensive evaluation of a
    licensee's clinical skills, competence and judgment, upon request of and
    for filing with the [b]oard," did not exceed the board's authority consis-
    tent with its duty under St. 1986, c. 351, to provide hospitals with risk
    management programs, nor conflict with statutory provisions requiring
    health care facilities to furnish other reports to the board, nor undermine
    the confidentiality provided by G. L. c. 111, § 204 (*a*) - (*d*), to hospital
    peer review committees. [178-179]
A regulation of the Board of Registration in Medicine, 243 Code Mass.
    Regs. § 3.07 (k) (1987), conflicted with the statutory privilege accorded

[1] The Brigham and Women's Hospital, Inc., The Children's Hospital
Corporation, Massachusetts Eye and Ear Infirmary, The General Hospital
Corporation, New England Deaconess Hospital Corporation, New England
Medical Center Hospitals, Inc., and University Hospital, Inc.

the activities of hospital peer review committees by G. L. c. 111, § 204 (*a*) - (*d*), and thus was invalid to the extent it authorized the board access to the "proceedings, reports and records" of such committees [179-181]; however, in all other respects the regulation was consistent with the legislative scheme of St. 1986, c. 351, to provide hospitals with risk management programs [179-184].

An action by hospitals challenging certain regulations of the Board of Registration in Medicine presented no issue as to the validity of 243 Code Mass. Regs. § 3.04 (1987), providing for designating as confidential certain items "related to" the activities of hospital peer review committees. [184]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on April 8, 1987.

The case was reported by *Abrams, J.*

*Gerald Gillerman* (*Gordon P. Katz & William M. Mandell* with him) for the plaintiffs.

*James M. Shannon,* Attorney General (*Carolyn V. Wood,* Assistant Attorney General, with him) for the defendant.

The following submitted briefs for amici curiae:

*Harold J. Bressler* of Illinois *& Richard A. Johnston,* for Joint Commission on Accreditation of Hospitals.

*Patrick R. Carroll, William T. McGrail & Dorothy Grandolfi Wagg,* for Massachusetts Hospital Association, Inc.

*Alfred Miller, Peter N. Greenwald & Joan S. Wise* of New York, for American Association of Retired Persons.

*Sander A. Rikleen, Walter L. Landergan, Jr., Kathleen R. Curtis & Michael J. Kelly,* for The Massachusetts Medical Society.

HENNESSEY, C.J. The plaintiffs (hospitals) seek a declaration under G. L. c. 30A, § 7, and c. 231A that five regulations of the Board of Registration in Medicine (board) adopted following the enactment of St. 1986, c. 351 — "An Act relative to medical malpractice" — are invalid because they conflict with statutes and are beyond the board's authority. A single justice of this court reported the case on the parties' cross motions for summary judgment.

Chapter 351 was enacted in response to a perceived medical malpractice crisis. Chapter 351, to the extent pertinent here,

amended sections of G. L. c. 111, which concern the Department of Public Health (DPH), and sections of G. L. c. 112, concerning the board.[2] The DPH is concerned with the "life, health, comfort and convenience" of Massachusetts citizens, and, more particularly, with hospital licensure. G. L. c. 111, §§ 5, 51 (1986 ed.). The board is responsible for regulating the practice of medicine, and, more particularly, for physician licensure. G. L. c. 112, §§ 2, 5 (1986 ed.).

Chapter 351, inter alia, requires reports to the board by a number of persons and organizations in circumstances of possible physician incompetence.[3] The statute also states that the board will provide "risk management programs" to hospitals,[4] and makes participation in such programs a condition of hospital[5] and physician licensure.[6] Chapter 351 also amended G. L. c. 111 to provide that medical peer review committee (PRC) "proceedings, reports and records" shall be confidential and immune from subpoena or discovery and that those attending a PRC meeting shall not be required or allowed to testify about the PRC proceedings.[7] These protections of PRC activities do not apply to board proceedings.

---

[2] Chapter 351 also amended G. L. cc. 6A, 13, 26, 175A, 231, 260, and St. 1975, c. 362.

[3] St. 1986, c. 351, § 14 (codified at G. L. c. 112, §§ 5B-5F).

[4] St. 1986, c. 351, §§ 9, 13 (codified at G. L. c. 111, § 203 [d]; G. L. c. 112, § 5). Chapter 351 leaves "risk management program" undefined.

[5] St. 1986, c. 351, § 9 (codified at G. L. c. 111, § 203 [d]).

[6] St. 1986, c. 351, § 13 (codified at G. L. c. 112, § 5).

[7] St. 1986, c. 351, § 9 (codified at G. L. c. 111, § 204 [a] - [d]). Unlike "risk management program," peer review committee is defined by c. 351. St. 1986, c. 351, § 6 (codified at G. L. c. 111, § 1). The statutory definition provides as follows: "'Medical peer review committee' or 'committee', a committee . . . of a medical staff of a licensed hospital or nursing home, provided the medical staff operates pursuant to written by-laws that have been approved by the governing board of the hospital or nursing home, which committee has as its function the evaluation or improvement of the quality of health care rendered by providers of health care services, the determination whether health care services were performed in compliance with the applicable standards of care, the determination whether the cost of health care services . . . rendered was considered reasonable by the providers of health services in the area, the determination of whether a

Following the enactment of c. 351 the board adopted regulations establishing the outlines of a Qualified Patient Care Assessment Program (QPCAP) which is the "risk management program" the board is charged with providing hospitals. See 243 Code Mass. Regs. § 3.02 (1987). The QPCAP seeks patient care improvement through, inter alia, strengthened requirements for establishing and verifying physicians' professional credentials ("credentialing"), 243 Code Mass. Regs. § 3.05 (1987), and increased incident reporting both within hospitals and to the board, 243 Code Mass. Regs. §§ 3.07-3.08 (1987). Structurally, the QPCAP requires, at minimum, the establishment of a hospital governing board level PRC known as a Patient Care Assessment Committee and the appointment of a Patient Care Assessment Coordinator who is responsible for the QPCAP's over-all operation. See 243 Code Mass. Regs. §§ 3.02, 3.06 (1987).[8] Medical staff level PRC's are also contemplated by the regulations. 243 Code Mass. Regs. § 3.06 (1) (b).

The hospitals challenge the board's authority to issue five of the regulations and the consistency of those regulations with c. 351 and other statutes. The challenged regulations are: 243 Code Mass. Regs. § 3.07 (3) (a), which requires all "health care providers" to report "injuries and incidents" to their Patient

---

health care provider's actions call into question such health care provider's fitness to provide health care services, or the evaluation and assistance of health care providers impaired or allegedly impaired by reason of alcohol, drugs, physical disability, mental instability or otherwise." The regulations seem to expand this definition by including quality assurance, risk management, and credentialing as possible PRC activities. 243 Code Mass. Regs. § 3.02 (1987). We read the protections granted to PRC's by G. L. c. 111, § 204 (a) - (d), to apply only to PRC activities within the statutory definition of G. L. c. 111, § 1.

[8] The regulations provide that a committee, rather than an individual, can perform the Patient Care Assessment Coordinator function. This optional committee is referred to as a Patient Care Assessment Committee. It is not clear if this entity is distinct from the mandatory hospital governing board PRC which, as noted above, is also called a Patient Care Assessment Committee, or if the mandatory committee can wear two hats at the hospital's discretion — that of "senior" PRC and QPCAP Coordinator.

Care Assessment Coordinators; 243 Code Mass. Regs. § 3.08, which requires hospitals to report "major incidents" to the board; 243 Code Mass. Regs. § 3.07 (3) (l), which requires hospitals to provide evaluations of staff physicians on the board's request; 243 Code Mass. Regs. § 3.07 (3) (k), which requires hospitals to allow the board and DPH to "access and audit" QPCAP information and records; and 243 Code Mass. Regs. § 3.04, which states that items the board receives "relate[d] to" PRC activities shall remain confidential. We conclude that 243 Code Mass. Regs. §§ 3.07 (3) (a), 3.08, and 3.07 (3) (l), are valid regulations. To the extent, and only to the extent, that 243 Code Mass. Regs. § 3.07 (3) (k) purports to grant the board and DPH access to PRC "proceedings, reports and records," it conflicts with the protections granted by G. L. c. 111, § 204 (*a*) - (*d*), and is invalid. Our view of 243 Code Mass. Regs. § 3.07 (3) (k) makes it unnecessary to resolve the alleged controversy over 243 Code Mass. Regs. § 3.04.

*Standard of Review.*

The hospitals concede that a "substantial burden [is] placed upon them in establishing the invalidity of the challenged regulations." This court's opinions establish that all presumptions are in favor of the validity of agency action, that a regulation may be authorized though not traceable to specific statutory language, that powers granted include those reasonably implied, that agencies have leeway in interpreting statutes they enforce, and that specific statutory authority does not bar consistent action under general authority. See, e.g., *Grocery Mfrs. of Am., Inc.* v. *Department of Pub. Health,* 379 Mass. 70, 74-76 (1979) (collecting cases); *Levy* v. *Board of Registration & Discipline in Medicine,* 378 Mass. 519, 524-525 (1979) (dealing with 1975 medical malpractice statute). The hospitals urge that closer scrutiny should be given to the agency action in this case than in the usual case because c. 351's division of responsibilities between the DPH and the board shows that the "Legislature has [not] granted broad agency authority [to the board] to deal with an entire area of activity." *Grocery Mfrs. of Am., supra* at 75. Applying such closer scrutiny here,

401 Mass. 172    177

Beth Israel Hospital Association *v*. Board of Registration in Medicine.

however, if that indeed is required, would not affect our analysis of the regulation's validity. See *id*. at 75-76 (court upholds action by agency not granted broad authority to deal with entire area of activity).

*The Challenged Regulations.*[9]

1. *243 Code Mass. Regs. § 3.07 (3) (a).*

This regulation places an "affirmative duty" on each health care provider to report "injuries and incidents" to the facility's Patient Care Assessment Coordinator. It also places related employee training responsibilities on the hospitals.

The hospitals' primary objection to § 3.07 (3) (a) is that it goes beyond the requirement of G. L. c. 111, § 203 (*a*), that hospital by-laws establish procedures for internal reporting of health care provider conduct that indicates incompetency or is inconsistent with good patient care. The hospitals also claim that by placing an "affirmative duty" on health care providers to report "injuries and incidents" to their Patient Care Assessment Coordinator, § 3.07 (3) (a) creates standards of care the breach of which could result in tort liability for health care providers or the hospitals. Similarly, the hospitals contend that the employee training aspects of § 3.07 (3) (a) will interfere with employment relations.

Given the deference paid to an agency's interpretation of its statutory powers, the hospitals' arguments are meritless. Even if it is assumed that § 3.07 (3) (a) requires more than G. L. c. 111, § 203 (*a*), the regulation is consistent with the statute. See *Grocery Mfrs. of Am., supra* at 76. More importantly, the board's determination that the internal reporting required by the regulation is a necessary component of the QPCAP, the risk management program the board must provide the hospitals, is reasonable. See *Levy, supra* at 525. That the regulation creates duties and possibly affects employment relationships,

[9] The challenged regulations appear in the appendix, *infra*. In addition to making their other arguments the hospitals challenge the board's basic authority to promulgate the challenged regulations. Such authority is both implicit in the board's statutory obligation to provide the hospitals with risk management programs and explicit in the board's power to adopt regulations governing the practice of medicine. G. L. c. 112, § 5 (1986 ed.).

as many regulations do, is irrelevant to the board's authority to promulgate the regulation.

2. *243 Code Mass. Regs. § 3.08.*

This regulation requires that hospitals report specified "Major Incidents" to the board. 243 Code Mass. Regs. § 3.08 (1) - (3).

The hospitals state a number of objections to § 3.08. First, they claim the board lacks authority to promulgate it. Second, they argue that § 3.08 conflicts with the requirements of G. L. c. 111, § 53B (requiring hospitals to report curtailment of physician privileges to the board), and G. L. c. 112, § 5F (requiring each health care provider to report to the board any person it reasonably believes has violated G. L. c. 112, § 5, or board regulations). Finally, the hospitals contend that requiring the major incident reports will undermine the protections provided to PRC activities by G. L. c. 111, § 204 (*a*) -(*d*).

The hospitals' objections to 243 Code Mass. Regs. § 3.08, like the objections to § 3.07 (3) (a), are unpersuasive. First, the board's power to issue § 3.08 is implicit in its power to provide hospitals with risk management programs. It is doubtful that the Legislature would charge the board with establishing such programs without also intending that the board be able to promulgate the necessary regulations. See *Grocery Mfrs. of Am.*, *supra* at 75.

Second, § 3.08 is consistent with, not contrary to, G. L. c. 111, § 53B, and c. 112, § 5F. These statutes do not state, as the hospitals argue, exclusive circumstances in which board reports are required. As with § 3.07 (3) (a), the board's determination that § 3.08's requirement of major incident reports is necessary to the QPCAP is not unreasonable and therefore must be upheld. See *Levy, supra* at 525.

Finally, the hospitals' argument that furnishing the board major incident reports will undercut the protections provided to PRC activities by G. L. c. 111, § 204 (*a*) - (*d*) (1986 ed.), overlooks that nothing in the regulation requires any PRC role in filing the reports. Presumably, the Patient Care Assessment Coordinator is responsible for a hospital's compliance with the regulations. That the board will be reviewing the reports during

the same period in which a PRC may be discussing the incidents in no way opens up the PRC "proceedings, reports and records" to the board.

3. *243 Code Mass. Regs. § 3.07 (3) (l).*

This regulation requires hospitals to establish a system to provide "a reasonable and comprehensive evaluation of a licensee's clinical skills, competence and judgment, upon request of and for filing with the Board."

As with 243 Code Mass. Regs. § 3.08, the hospitals argue that the board has no authority to issue § 3.07 (3) (l), that it conflicts with G. L. c. 112, § 5I, which allows the board to request reports of results of given surgical or other medical procedures on a physician-by-physician basis, and that compliance with it will undercut the protections provided PRC activities by G. L. c. 111, § 204 (*a*) - (*d*). The hospitals also contend that this regulation improperly requires them to be the board's expert on demand.

For the reasons discussed above in connection with § 3.08 the hospitals' first three objections are overcome. The board's authority to issue § 3.07 (3) (l) flows from its duty to provide risk management programs to the hospitals. The regulation is consistent with G. L. c. 112, § 5I's provision for requiring reports on a physician-by-physician basis, and does not require any PRC involvement in the evaluation, thus avoiding any possible transgression of G. L. c. 111, § 204 (*a*) - (*d*).

The hospitals' argument that § 3.07 (3) (l) requires them to be the board's expert on demand is off point. The cases relied on involve parties seeking to compel unwilling witnesses to provide expert testimony in adversary proceedings. See, e.g., *Commonwealth* v. *Vitello,* 367 Mass. 224, 235 (1975). The context of § 3.07 (3) (l) is the board's information gathering and assessment of the QPCAP's efficacy.

4. *243 Code Mass. Regs. § 3.07 (3) (k).*

This regulation requires the hospitals to establish procedures whereby the DPH and board can "access and audit" the "[QPCAP] information and records during normal business hours." As the hospitals note, because the QPCAP requires hospital action and information gathering in a number of areas,

this regulation would give the board access to a wide variety of hospital records including those relating to quality assurance, risk management, and peer review (243 Code Mass. Regs. § 3.02); physician credentialing (243 Code Mass. Regs. § 3.05); incident reporting (243 Code Mass. Regs. §§ 3.07, 3.08); and patients' records (243 Code Mass. Regs. § 3.10 [2]).

As with the other regulations, the hospitals have a number of objections to § 3.07 (3) (k). They argue that the board is without authority to issue § 3.07 (3) (k), and that the regulation conflicts with G. L. c. 112, § 5, which gives the board subpoena power to pursue records in the context of physician investigations. These arguments are again unpersuasive. The board's authority to issue § 3.07 (3) (k) is implicit in its duty to provide risk management programs, and the regulation, so far as it is valid, is consistent with, not contrary to, G. L. c. 112, § 5.

The hospitals' further arguments against § 3.07 (3) (k) are more troublesome. First, they contend that § 3.07 (3) (k) conflicts with provisions of G. L. c. 111, § 204 (*a*) - (*d*), protecting PRC activities in that the regulation would make PRC items available to the board outside the context of formal board investigations and proceedings.[10] Second, the hospitals argue that § 3.07 (3) (k) violates the general legislative scheme because the DPH, not the board, is given inspection and audit powers in G. L. c. 111 and because c. 351 contemplates board access to information only after other entities have made threshold determinations of possible physician malpractice.

We look to the Legislature's intent as expressed in the plain language of the statute to determine whether § 3.07 (3) (k) conflicts with G. L. c. 111, § 204 (*a*) - (*d*). Section 204 (*a*) provides that PRC "proceedings, reports and records" are confidential and "shall not be subject to subpoena or discovery, or introduced into evidence, in any judicial or administrative proceeding, except proceedings held by the board of registra-

---

[10] The hospitals also mention, but do not discuss, a possible conflict with the patients' records privilege of G. L. c. 111, § 70. The hospitals are free to challenge board access to given records on this ground on a case-by-case basis in the future.

tion in medicine, and no person who was in attendance at a meeting of a medical peer review committee shall be permitted or required to testify in any such judicial or administrative proceeding, except proceedings held by the board of registration in medicine, as to the proceedings of such committee or as to any findings, recommendations, evaluations, opinions, deliberations or other actions of such committee or any members thereof." Section 204 (*b*) and (*c*) provide that information available from other sources is not privileged simply because also submitted to a PRC. Finally, the last sentence of § 204 (*b*) states that the "provisions of this section [do not] apply to any investigation or administrative proceeding conducted by the board of registration in medicine."

The hospitals argue that § 204 creates a strong PRC privilege which allows access to PRC items only when the board is conducting a formal investigation or disciplinary proceeding with regard to a physician pursuant to G. L. c. 30A.[11] The hospitals note that the statutory and regulatory references to board investigations all involve investigations of particular physicians pursuant to filed complaints. See, e.g., G. L. c. 112, § 5, first, second, seventh, and ninth pars. (1986 ed.); 243 Code Mass. Regs. § 1.03 (1) - (3) (1987). The hospitals' basic point is that the plain meaning of the term proceedings as used throughout § 204 "is formal, adversarial proceedings against a particular party, . . . a Chapter 30A disciplinary proceeding against a specific licensee."

The board contends that § 204 creates only a qualified privilege which should be narrowly construed. The board's basic argument is that, in view of the more active role c. 351 assigns the board, the terms investigation and administrative proceeding as used in § 204 (*a*) and § 204 (*b*) create a broad

[11] More precisely the hospitals contend that PRC proceedings, records, and reports are only available once the board has begun a c. 30A adversary proceeding. Testimony of witnesses before a PRC, in contrast, would be obtainable by the board both during its investigation of a complaint and in any resultant c. 30A proceeding. Compare G. L. c. 111, § 204 (*a*) (except board proceedings), with § 204 (*b*) (except board investigations or proceedings).

exception to the PRC privilege, and the board's determination that it needs open access to all QPCAP records, including PRC items, is reasonable. The board also argues that the past failure of PRC activities to reduce malpractice indicates that the Legislature could not have intended only narrow board access to PRC items.

A number of factors show that the board's construction of the PRC privilege's scope is unreasonable. The board's approach reads the "investigation or [board] administrative proceeding[s]" language of the last sentence of § 204 (b) into § 204 (a), which refers only to board "proceedings," *supra*, note 11, and concludes PRC items are available to the board in all its activities. The board makes no effort to justify this interpretational addition of words to § 204 (a).

On a more basic level, open-ended board access to PRC items is antithetical to the newly created PRC privilege. It does not seem reasonable that the Legislature would create a PRC privilege and through an exception undercut the confidentiality that that privilege allows. If the privilege was designed to do anything, it was designed to foster aggressive critiquing of medical care by the provider's peers. An exception as broad as the board envisages frustrates this goal.

Other considerations show that the board's construction of § 204 is unreasonable. First, § 204 (a)'s approach of establishing a broad privilege with only one exception indicates an element of exclusivity. When the board attempts to add to that exception through § 3.07 (3) (k), the regulation conflicts with rather than conforms to the statute. Compare, *supra,* discussion of other challenged regulations' conformity with statutes. Second, when the board argues that PRC activities have failed to reduce malpractice in the past, it overlooks the fact that such activities were never before privileged. See *Cronin* v. *Strayer,* 392 Mass. 525, 532 (1984). Further, reading the exception to the privilege narrowly is consistent with our cases where we have refused to add to the listed exceptions to a given statutory privilege. *Petition of Catholic Charitable Bureau of the Archdiocese of Boston, Inc., to Dispense with Consent to Adoption,* 392 Mass. 738, 742 (1984).

That § 3.07 (3) (k) is invalid to the extent it authorizes board access to PRC "proceedings, reports and records" does not entirely invalidate the regulation. Board access to all other information generated by the QPCAP system in no way would violate the PRC privilege and is within the board's authority implied from its statutory responsibility to provide the QPCAP. Thus, the hospitals should make available to the board all incident reports, patient complaints, employee training materials, credentialing items, Patient Care Assessment Coordinator reports, and other items they are charged with generating. Reviewing these items will assist the board in overseeing and improving the risk management program it provides the hospitals. It is only where the board seeks PRC "proceedings, reports and records" that § 204's PRC privilege stands in the way.[12] Section 204 promotes the uninhibited expression of professional opinions before a PRC and protects the PRC's work product. Section 204 does not protect information generated by other components of the QPCAP system or the "raw materials" relied on by a PRC if obtained from other sources. See G. L. c. 111, § 204 (*b*), (*c*) (1986 ed.).

The hospitals also argue that § 3.07 (3) (k) is invalid because it conflicts with c. 351's over-all scheme. If true this would prevent access to the QPCAP generated information which is not covered, as noted above, by § 204's protection of PRC "proceedings, reports and records." The argument is, however, easily addressed. That the Legislature has given hospital inspection powers to DPH — G. L. c. 111, §§ 53, 54 — does not prevent the board from reasonably determining that "access and audit" of QPCAP items is necessary to fulfilling its mandate of providing risk management programs to hospitals. The regulation does not empower general inspection of hospital facilities as a condition of licensure; that is the DPH's province.

---

[12] If a hospital opts to have a Patient Care Assessment Committee which is a PRC perform the Patient Care Assessment Coordinator functions, only those "proceedings, reports and records" reflecting the committee's peer review work would be privileged. In short, a hospital should not be able to make nonpeer review items privileged by having a PRC perform the Patient Care Assessment Coordinator role. See *supra*, notes 7-8.

The regulation only allows DPH and board review of QPCAP generated files.

Similarly, that statutes require reports to the board after a number of entities make preliminary determinations of possible malpractice in no way prevents the board from seeking information concerning the QPCAP. The statutorily required information implicates the board's disciplinary powers, whereas the information reviewed under § 3.07 (3) (k) allows the board to assess the QPCAP on a continuing basis.

5. *243 Code Mass. Regs. § 3.04.*

This regulation seeks to maintain the confidential status of PRC and PRC-related items which the board expects to receive under the QPCAP regulations. To the extent that the board cannot obtain PRC "proceedings, reports and records" under the above analysis of § 3.07 (3) (k), the contest over § 3.04 is moot. Section 3.04 does, however, speak of designating as confidential items related to PRC activities. The validity of such action is not clear, given the statutory definition of public records contained in G. L. c. 4, § 7, cl. 26. Items related to PRC records, unlike PRC "proceedings, reports and records" themselves, would not seem to fit exemption (a) of G. L. c. 4, § 7, cl. 26 (items exempted from disclosure by statute). Where, however, no particular designation of "related to" items as confidential is currently at issue between the parties, we need not reach the alleged controversy over § 3.04. See *Grocery Mfrs. of Am., supra* at 77.

*Conclusion.*

In sum, a judgment is to enter declaring that 243 Code Mass. Regs. §§ 3.07 (3) (a), 3.08, and 3.07 (3) (l) are validly promulgated pursuant to the board's power to provide risk management programs to hospitals, are consistent with, not contrary to, existing statutes, and do not impinge on G. L. c. 111, § 204's PRC privilege. The judgment shall also declare that § 3.07 (3) (k), in contrast, does conflict with the PRC privilege to the extent it seeks access to PRC "proceedings, reports and records." This analysis of § 3.07 (3) (k) eliminates the alleged controversy over § 3.04.

*So ordered.*

APPENDIX.

243 Code Mass. Regs.

*3.04: Confidentiality of Records and Information*

(1) To promote free and full compliance with the reporting requirements set forth below, which will enhance the protection of the public, information and records both generated pursuant to these regulations and which relate to the functions of a "Medical Peer Review Committee" (as defined by M.G.L. c. 111, s. 1), are hereby deemed confidential and, to the extent allowable under M.G.L. c. 111, s. 204, not subject to subpoena, discovery or introduction into evidence.

(2) To protect the confidentiality of information and records both generated pursuant to these regulations and which also relate to the functions of a "Medical Peer Review Committee" (as defined by M.G.L. c. 111, s. 1) and to assure that this information and these records are not subject to subpoena, discovery or introduction into evidence, the Patient Care Assessment Coordinator may designate such information and records as "proceedings, reports and records of a medical peer review committee," within the meaning of M.G.L. c. 111, s. 204(a).

(3) Information and records so designated by the Patient Care Assessment Coordinator pursuant to the paragraph above may be maintained or utilized by the Board of Registration in Medicine, including but not limited to its Data Repository and its Disciplinary Unit, in its investigations or its other proceedings. Such information and records maintained or utilized by the Board shall remain confidential and not subject to subpoena, discovery or introduction into evidence, consistent with M.G.L. c. 111, s. 204. However, such information and records may not remain confidential if disclosed in an adjudicatory proceeding, but the information and records shall be otherwise subject to any protections provided by M.G.L. c. 111, s. 204.

(4) The provisions in this section shall not apply to "proceedings, reports and records of a medical peer review committee," within the meaning of M.G.L. c. 111, s. 204(a), if such proceedings, reports or records are obtained from a source independent of a Medical Peer Review Committee.

*3.07: Qualified Patient Care Assessment Program — Internal Audits and Internal Incident Reporting*

. . . .

(3) The health care facility and medical staff bylaws shall authorize the establishment of the following elements of a Qualified Patient Care Assessment Program:

(a) The development and implementation of an incident reporting system based upon an affirmative duty of all health care providers to report injuries

and incidents in writing to the Patient Care Assessment Coordinator. As part of the incident reporting system, procedures shall be detailed in writing and disseminated to all employees of the health care facility involved in patient care. All new employees, within five days of employment, shall receive written instructions, and within thirty days, shall receive orientation and training, in the operation of the system and their responsibilities within it. At least annually, all appropriate employees shall be provided at least three hours patient care assessment and quality assurance education and training, with emphasis upon the importance of accurate and timely incident reporting. All new employees' education and training and all annual training shall also include specific instruction in Patients' Rights pursuant to M.G.L. c. 111, s. 70E.

. . . .

(k) Provisions to grant the Board and the Department of Public Health with access and audit authority over Qualified Patient Care Assessment Program information and records during normal business hours.

(l) Provisions to require administration of a reasonable and comprehensive evaluation of a licensee's clinical skills, competence and judgment, upon request of and for filing with the Board.

*3.08: Qualified Patient Care Assessment Program — Major Incident Reporting to Board of Registration in Medicine.*

(1) Introduction. The establishment by health care facilities of focused occurrence and occurrence screening criteria is designed to facilitate the generation of internal institutional incident reports and to assist in the analysis of specific incidents and patterns at the health care facility. In addition, to permit the Board to conduct its own timely assessment of those major incidents that may represent the most severe adverse patient outcomes, there is a necessity for reporting such major incidents directly to the Board by each health care facility. These reportable major incidents will consist, initially, of two types of events. First, there will be reporting of a small number of specified outcomes without regard to the underlying circumstances (Category I "Major Incidents"). The second, broader category of incidents reportable to the Board consists of severe adverse outcomes when analysis indicates that the outcome fell outside the realm of generally accepted and expectable results, taking into account the nature of the underlying disease process and the recognized risks and benefits of the appropriate medical response to it (Category II "Major Incidents"). An event may fall into this second category solely by virtue of its rarity as a natural outcome of the disease or intervention and inclusion in this category explicitly does not presuppose either that the outcome was preventable or that it resulted from substandard medical practice. The Board plans to assess the yield of these two separate types of reportable major incidents to determine whether one or the other approach is more useful in identifying potentially preventable adverse outcomes and will, on the basis of such assessment, work with

health care facilities and licensees to expand or refine the contents of the two categories of reportable major incidents.

(2) The following "reportable major incidents" must be reported by the health care facility to the Board:

(a) Category I incidents:

1. Maternal deaths which are related to delivery.

2. Fetal deaths. A "fetal death," as defined by M.G.L. c. 111, s. 202, means death prior to the complete expulsion or extraction from its mother of a fetus, irrespective of the duration of pregnancy, as indicated by the fact that after such expulsion or extraction the fetus does not breathe or show any other evidence of life such as beating of the heart, pulsation of the umbilical cord, or definite movement of voluntary muscles. "Fetal death" does not include an abortion as defined in M.G.L. c. 112, s. 12K.

3. Chronic vegetative state resulting from medical intervention.

4. Death in the course of or resulting from ambulatory surgical care.

(b) Category II incidents: major or permanent impairments of bodily functions or deaths that are not ordinarily expected as foreseeable results of the patient's condition or of appropriately selected and administered treatment.

(3) Health care facilities shall file major incident reports with the Board on a quarterly basis. The major incident report shall contain, for each major incident, the name of the licensee, the license number, a brief description of the major incident, and, if any, results of an internal investigation and corrective measures. In the case of reporting fetal deaths, the health care facility may discharge its reporting obligations under this section by filing with the Board the form prescribed by the Department of Public Health pursuant to M.G.L. c. 111, s. 202, with the names of the parents excluded. In lieu of providing the names of the licensees and the license numbers, the health care facilities may provide unique coded identifiers, pursuant to a Statewide Coded Identifier System, provided that such a Statewide Coded Identifier System is approved by majority vote of the Board.

(4) This section does not relieve the health care facility of any other reporting obligation required under law or regulation, including but not limited to M.G.L. c. 111, s. 53B, and regulations related thereto.