Tierney, J.
This matter is before the court on the parties’ cross-motions for summary judgment pursuant to Mass.R.Civ.P. 56(c). The plaintiffs, Melissa Silva (Melissa) and Andrew Pierre (Andrew),[2] brought this action seeking both declaratory and injunctive relief to enforce rights they claim they are entitled to under G.L.c. 123B, §3 and the companion regulations, whenever the Department of Mental Retardation (DMR) seeks to transfer them from one facility to another. The complaint also contains claims under both the Massachusetts Civil Rights Act and the Federal Civil Rights Act.[3] The plaintiffs are entitled to declaratory and injunctive relief as set forth below.
BACKGROUND
A)THE PLAINTIFFS
Melissa Silva (Melissa) and Andrew Pierre (Andrew) are individuals with severe mental retardation who are both full-time residents at the Crystal Springs School in Assonet, Massachusetts (Crystal Springs). In addition to mental retardation, both plaintiffs also suffer from various medical and behavioral disorders. Melissa’s date of birth is August 15, 1971, while Andrew was born February 8, 1972. Melissa and Andrew have both lived at Crystal Springs for over fifteen years.
B)CRYSTAL SPRINGS
Crystal Springs provides its clients with twenty-four hour supervised residential care. Client services range from the basics of food, shelter, and laundry services to advanced medical, psychiatric, psychological and nursing services. Other services provided to clients at Crystal Springs include, but are not limited to, physical, occupational, audiological and speech therapy.
C)“TURNING 22"
Melissa and Andrew were originally placed at Crystal Springs as special education placements pursuant to G.L.c. 7 IB and their care was paid for by their local school districts.[4] At least two years before a student in this program approaches graduation or age 22, either of which will terminate the student’s entitlements, the school district must determine whether the student will need adult rehabilitative services after their c. 71B entitlements end. G.L.c. 71B, §12C. Individuals in this position are often referred to as “Turning 22" students. If the school district determines that such services will in fact be needed, the student may ultimately be referred to DMR, as were Melissa and Andrew.
DMR must first determine if the student is eligible for DMR services and then determine if it has the resources to serve that individual’s needs. See 104 C.M.R. §§21.02 and 21.27. At the same time, DMR develops a individual transition plan (ITP) for the person which is used to identify the appropriate adult services needed by the person. 101 C.M.R. §10.01 et seq. The development of the ITP involves not only the agencies that will be involved in the individual’s care, but also the individual's parents /guardians and, if possible, the individual receiving services. 101 C.M.R. §10.06(2). The DMR then initiates a Request for Proposal process (RFP) which is a competitive bidding process for selecting a service provider. Once an individual begins to receive adult services, the DMR must begin to develop an individual service plan (ISP) which sets out the objectives for the individual for the coming year. 104 C.M.R. §21.46(1). In the absence of an ISP, the client’s transitional plan, ITP, remains in effect. 101 C.M.R. §10.09(2).
DMR has funded Melissa’s placement at Crystal Springs since approximately August 1993 and Andrew’s since approximately February 1994. DMR developed an ITP for both Melissa and Andrew and then selected a service provider via the RFP process. Andrew’s plan called for placement in a community- *224 based home and, although Ciystal Springs submitted a bid, his service contract was awarded to Eastern Middlesex Human Services (EMHS). When the Pierres were notified of this placement, Mr. Pierre wrote back to DMR stating that he wanted Andrew to remain at Crystal Springs. DMR considered this a rejection of services and notified the Pierres that Andrew’s funding at Crystal Springs would be terminated as of July 20, 1994. The Pierres then joined the present action.
Similarly, Melissa’s service contract was put out to bid and was awarded to South Shore Mental Health which was to serve Melissa at a group home in West-port, Massachusetts. The Silvas wanted Melissa to remain at Crystal Springs and, therefore, DMRnotified them that Melissa’s funding would cease on July 11, 1994. The Silvas then joined the present action.
D) PROCEDURAL BACKGROUND
At the time Melissa and Andrew became parties to this action, a TRO had already issued prohibiting Patrick Grady’s transfer from Crystal Springs and ordering DMR to continue funding his care.
On August 30, 1994, the Superior Court (Xifaras, J.) issued a preliminary injunction in this matter enjoining DMR from transferring any of the plaintiffs in this action from the Crystal Springs School and ordering that DMR continue to fund the plaintiffs’ placement at Crystal Springs until further order of the court [2 Mass. L. Rptr. No. 29, 587 (1994)]. The injunction continues in effect to the present date.
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving parly is entitled to judgment as a matter of law. Kourouvadlis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue “and [further] that the moving party is entitled to judgment as a matter of law.” Pederson v. Time Inc., 404 Mass. 14, 16-17 (1989). Where both parties have moved for summary judgment and “in essence there is no real dispute as to the salient facts or if only a question of law is involved,” summary judgment shall be granted to the party entitled to judgment as a matter of law. Cassesso, supra.
The dispute in the present matter centers on the proper interpretation and application of the statutes and regulations pertaining to the transfer of clients by DMR. The plaintiffs contend that they are entitled to the transfer rights provided for in G.L.c. 123B, §3 and DMR’s transfer regulations. DMR counters that the statute and regulations are inapplicable to persons in the plaintiffs’ position.
Chapter 123B, §3 addresses the transfer of persons by the DMR from one facility to another and states in relevant part:
The [DMR] shall notify and consult with the permanent guardian ... of a mentally retarded person, prior to the transfer of said person from one residential facility for the mentally retarded to another
If a permanent guardian has been appointed for a mentally retarded person who is receiving residential services through the department, said department shall request said guardian’s consent prior to the transfer . . .
If the individual service plan developed for the mentally retarded person by the department . . . cannot be fully implemented as a result of the guardian’s objection to a proposed transfer, the department shall. . . ñle a request for an adjudicatory proceeding with the division of administrative law appeals.
A) CRYSTAL SPRINGS IS A FACILITY
At the time of the hearing on the preliminary injunction in this matter, DMR argued that the plaintiffs were not covered by c. 123B because Crystal Springs was not a “facility” as the term was used in the statute. Although DMR does not raise this issue in defense to the plaintiffs’ present motion, the court will briefly address it.
The statute states that it applies to the transfer of individuals “from one residential facility for the mentally retarded to another.” Chapter 123B, §1, defines a facility for the purposes of the statute as “a public or private facility for the care and treatment of mentally retarded persons.” Given the extensive services provided by Crystal Springs to its residents, it clearly falls within the definition of a “facility.” To the extent that any of DMR’s regulations can be read as creating a narrower definition of “facility,” they are in conflict with the statute and, therefore, invalid. See Beth Israel Hospital Assoc. v. Board of Registration in Medicine, 401 Mass. 172, 176 (1987).
B) G.L.c. 123B DOES APPLY TO THOSE IN PLAINTIFFS' POSITION
DMR now argues that the statute does not apply to individuals, such as Melissa and Andrew, who are receiving residential services on a “temporary” basis between their 22nd birthday and the development and implementation of their adult service plan. Specifically, the department argues that the statute only applies to transfers of clients within the adult service system, not where a person is initially transferring into the adult system from another program.
Pursuant to chapter 123B, §3, DMR shall notify, consult with and request consent from the permanent guardian of a mentally retarded person who is receiving residential services from DMR prior to transferring that person from one residential facility for the men *225 tally retarded to another. If the guardian objects to such a transfer, it does not take place unless DMR prevails at an adjudicatory hearing. The statute requires DMR to request such a hearing where the proposed transfer will interfere with a client’s ISP. The statute mentions no other circumstances where a hearing must or may be held.
At the time this suit commenced, the applicable transfer regulation promulgated under the statute was found at 104 C.M.R. §21.63, and in accordance with the statute, applied only where a transfer would result in a modification of an individual’s ISP. Therefore, DMR argues, the statute clearly only applies to those already in the adult service program as an ISP is only developed once a person begins receiving adult services from DMR. As the plaintiffs did not yet have ISPs in place, DMR’s argument goes, they were not entitled to any transfer rights and to allow them such rights would leave DMR with no right of appeal.
Although superficially appealing, at bottom DMR’s contentions lack merit. DMR may not rely on its own failures to develop ISPs for the plaintiffs in order to avoid the provisions of the statute, nor may it rely on conflicting regulations it created. DMR’s regulations state that the development of an ISP must begin within 75 days of when an individual begins to receive adult services. 104 C.M.R. §21.45. Arguably this is a reasonable amount of time to start developing an ISP for someone just beginning with DMR’s adult services. However, in the case of persons in the position of Melissa and Andrew, DMR had at least two years notice that they would be entering the adult system and ISPs could easily be developed well prior to their 22nd birthday. In addition, both Melissa and Andrew have been receiving adult services for over a year and, therefore, there is no excuse for their lack of ISPs.
Likewise, DMR’s argument that c. 123B and its regulations do not apply to those receiving “temporary” funding from DMR is completely specious. The statute refers to “mentally retarded person[s] who [are] receiving residential services through the department.” Melissa and Andrew are clearly receiving such services and the fact that DMR’s brief may refer to their funding as being “temporary” or “interim” funding is unsupported by any evidence and is irrelevant. The statute makes no such distinction between the form in which the person receives the services. In addition, DMR itself defines temporary services as those lasting less than 30 continuous days or less than 60 days total in a year. Services in excess of these limits must be provided in accordance with an ISP. 104 C.M.R. §21.31. Accordingly, the plaintiffs are covered under the statute and are entitled to the transfer rights it contains.
Finally, the court notes that following the issuance of the preliminary injunction in this matter, in which the issuing justice (Xifaras, J.) noted that DMR’s existing regulations would most likely be found invalid, DMR promulgated a new set of regulations which do in fact specifically exclude persons in the position of Melissa and Andrew from coverage under the provisions of the transfer statute. See 115 C.M.R. §6.63. To the extent that the restrictions in this regulation conflict with the rights granted by the statute as discussed above, the regulation is invalid. See Beth Israel Hospital Assoc. v. Board of Registration in Medicine, 401 Mass 172, 176 (1987).
ORDER
It is hereby DECLARED that the Department of Mental Retardation has violated the rights of Melissa Silva and Andrew Pierre by failing to comply with the procedures set forth in G.L.c. 123B, §3 and 104 C.M.R. §21.63. Accordingly, it is hereby ORDERED that the Department of Mental Retardation is enjoined from transferring Melissa Silva and/or Andrew Pierre from Crystal Springs School and the Department of Mental Retardation shall continue to fund the placement of Melissa Silva and Andrew Pierre at Crystal Springs School until such time as the Department has complied with the provisions of G.L.c. 123B, §3 by obtaining the consent to transfer of Melissa Silva and Andrew Pierre through their legal guardians or has prevailed at an adjudicatory hearing as provided for in G.L.c. 123B, §3.

Plaintiff Patrick F. Grady’s claims were dismissed as moot on February 21, 1995.

Although both of the parties’ cross-motions for summary judgment simply state that they seek summary judgment, without specifying any of the counts in the Second Amended Complaint, they have limited their arguments to Count I, which seeks declaratory and injunctive relief. Accordingly, the court will not address Counts II and III, which allege violations of the plaintiffs’ state and federal civil rights.

Chapter 7IB entitles persons with mental retardation to special education services until they graduate from high school or reach age twenty-two, whichever comes first.