JOHN F. CARR *vs.* MARJORIE A. HOWARD, administratrix[1];
NEW ENGLAND DEACONESS HOSPITAL CORP., third-party
defendant.

Suffolk. November 4, 1997. - January 22, 1998.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Board of Registration in Medicine. Hospital,* Peer review, Patient care assess-
ment. *Privileged Communication. Negligence,* Hospital. *Statute,* Construc-
tion. *Practice, Civil,* Discovery, In camera review.

Discussion of Federal and State law relating to medical peer review and the
confidentiality of information and records relating thereto, and discussion
of the legislative history of G. L. c. 111, §§ 204 and 205. [517-522]
A hospital, a third-party defendant in a wrongful death action, that during
discovery refused to produce incident reports of the death on the ground
that the documents were privileged under G. L. c. 111, §§ 204 and 205,
demonstrated that the information sought was "necessary to comply" with
risk management and quality assurance programs established by the board
of registration in medicine and that the information was "necessary to the
work product" of "medical peer review committees," within the meaning
of the statute. [522-526]
General Laws c. 111, §§ 204 and 205, create an absolute privilege with
respect to records of a medical peer review committee, and, if a judge
must rule on a discovery request for such materials and uncontrovertedly
the statute applies, an in camera review of the records would not be neces-
sary or appropriate. [526-531]
In a wrongful death action in which a hospital was a third-party defendant, the
hospital demonstrated uncontrovertedly that certain incident reports
concerning the death were absolutely privileged under G. L. c. 211, §§ 204
and 205, consequently, there was no reason for the judge to conduct an in
camera review of those documents [531-532]; however, the plaintiff was
not foreclosed from pursuing other avenues of discovery to elicit the
information sought [532-533].

CIVIL ACTION commenced in the Supreme Judicial Court for
the county of Suffolk on April 9, 1997.

---

[1] Of the estate of Stanley W. Howard.

The case was reported by *O'Connor*, J.

*Robert P. Powers* (*Matthew J. Kadnar* with him) for New England Deaconess Hospital Corp.

*Michael A. West* for John F. Carr.

*Edmund P. Daley* for Marjorie A. Howard, was present but did not argue.

The following submitted briefs for amici curiae:

*James T. Hilliard & Jason R. Talerman* for The Massachusetts Psychiatric Society.

*Fredric J. Entin & James A. Henderson,* of Illinois, & *Scott L. Robertson & Virginia H. Hackney,* of Virginia, for American Hospital Association.

*Carl Valvo, Thomas R. Kiley, Matthew L. Schemmel & Michael J. Kelly,* for The Professional Liability Foundation, Ltd.

*John J. St. Andre, Jr., & Edwin L. Wallace* for Massachusetts Academy of Trial Attorneys.

FRIED, J. This case presents the question whether, during the discovery process, the confidentiality provisions of G. L. c. 111, §§ 204 and 205, preclude in camera review of "incident reports" by a trial judge to determine whether the medical peer review committee privilege of § 204 applies. We hold that in camera review is not appropriate in this case.

## I

On July 22, 1993, Stanley W. Howard (Howard), a psychiatric patient at New England Deaconess Hospital (Deaconess), broke away from an escort as he was being transported between buildings and jumped to his death from the fifth floor of the hospital parking garage, landing on John F. Carr. Carr filed suit against Marjorie A. Howard, the administratrix of Howard's estate. The administratrix then filed a third-party suit against Deaconess and others seeking contribution toward any judgment rendered in favor of Carr, and for wrongful death, alleging negligence in the care of Howard.

On September 30, 1996, Carr served a subpoena on Deaconess seeking records related to Howard's condition or care, including any "incident/deviation/unusual occurrence report, prepared by the New England Deaconess Hospital, its agents,

servants, employees or staff." Deaconess refused to produce such documents on the ground that they were privileged under G. L. c. 111, §§ 204 and 205, as necessary to the work of a medical peer review committee. Carr moved in the Superior Court to compel Deaconess to produce any incident reports regarding Howard's death.[2] On December 16, 1996, Deaconess opposed Carr's motion and submitted an affidavit of its assistant general counsel, stating that the incident reports in question were necessary to comply with risk management and quality assurance programs established by the board of registration in medicine (board), that these reports were not available from any independent source and were not part of the medical record of a patient, and that the reports were necessary to the work of a medical peer review committee.

After a status conference, the judge ordered the incident reports produced for in camera review. Deaconess refused to comply. On February 10, 1997, Deaconess submitted a supplemental memorandum in opposition to Carr's discovery request and an additional set of affidavits. These included affidavits from the vice-chairman of the medical executive committee and a member of the patient care assessment committee, the director of clinical psychiatry at Deaconess, the program director of the department of psychiatry at Deaconess, and the patient care assessment coordinator at Deaconess. These affidavits stated that incident reports are necessary to the work of the patient care assessment committee and that in camera review would negatively affect the functioning of the medical peer review process at Deaconess. The affidavits also provided a complete description of the peer review process. In addition, Deaconess submitted its bylaws, rules, and regulations.

On February 27, 1997, a Superior Court judge entered a written order again directing Deaconess to produce the documents for in camera review. Pursuant to G. L. c. 231, § 118, first par., Deaconess then sought interlocutory review before a single justice of the Appeals Court. The single justice denied the hospital's petition for relief, writing that determining "what is medical peer review committee material . . . is something best accomplished in an in-camera examination." Deaconess sought

---

[2]There are three incident reports at issue in this case: (1) a report authored by the nurse manager at Deaconess, (2) a report by a Deaconess emergency room staff nurse, and (3) a report of the incident prepared by the department of psychiatry.

review before the single justice of this court. On May 14, 1997, the single justice entered an order reserving and reporting the matter to the full court.[3]

## II

The medical profession has historically regulated itself through internal hospital disciplinary proceedings designed to identify and remedy instances of substandard care. See Adler, Stalking the Rogue Physician: An Analysis of the Health Care Quality Improvement Act, 28 Am. Bus. L.J. 683, 696 (1991). In the 1980s, in response to a perceived medical malpractice crisis and doubts about the efficacy of self-regulation by the medical profession, the Federal government and various State legislatures attempted to bolster medical peer review. In 1986, Congress passed the Health Care Quality Improvement Act (HCQIA), 42 U.S.C. §§ 11101-11152 (1994), which required hospitals to consult a national data bank of physicians when considering granting a doctor staff privileges, 42 U.S.C. § 11135(a)(1), and to inform the data bank when a doctor's privileges were suspended.[4] The HCQIA made records reported to the Federal data bank confidential, 42 U.S.C. § 11137(b), and granted immunity to participants in the peer review process. 42 U.S.C. § 11111(a)(1) (providing that professional review bodies and persons participating therein "shall not be liable in damages under any law of the United States or of any State with respect to the action," except the Federal Civil Rights Act).

The HCQIA made confidential only those documents actually submitted to the national data bank. As there is no claim under the Federal statute, the matter must be resolved under State law. Although Massachusetts provided no common law privilege for

---

[3]Because this case presents a serious challenge to the Legislature's statutorily enacted privilege for medical peer review materials, and because of the public interest in the proper application of the statutory framework enacted in G. L. c. 111, §§ 204 and 205, we find it appropriate to exercise our general superintendence power under G. L. c. 211, § 3. Although discovery disputes are generally not appropriate for such review, in this case a single justice has reported this case, indicating that a discretionary exercise of G. L. c. 211, § 3, authority is warranted. See *Purcell* v. *District Attorney for the Suffolk Dist.*, 424 Mass. 109, 111 (1997).

[4]The purpose of the national data bank was to curtail interstate or inter-hospital migration by disciplined doctors seeking to evade their punishment or public scrutiny. The National Practitioner's Data Bank was established by regulation in 1989. See 45 C.F.R. § 60.9(a)(3) (1996).

materials submitted to or produced by a medical peer review committee, see *Cronin* v. *Strayer*, 392 Mass. 525 (1984), in 1986 the Legislature enacted St. 1986, c. 351 (Chapter 351), to provide a measure of confidentiality to the work of medical peer review committees. Chapter 351, § 9, requires, as a condition of licensure, that hospitals participate in "risk management programs" to review past performance and prevent future harm to patients. See G. L. c. 111, § 203 (*d*). To promote candor and confidentiality in the review process, G. L. c. 111, § 204 (*a*), provides that:

> "[T]he proceedings, reports and records of a medical peer review committee shall be confidential and shall not be subject to subpoena or discovery, or introduced into evidence, in any judicial or administrative proceeding . . . ."

Today, almost every State has enacted a similar statutory privilege to protect the work of medical peer review committees. See Comment, The Medical Review Committee Privilege: A Jurisdictional Survey, 67 N.C. L. Rev. 179, 179 (1988).

Pursuant to Chapter 351, the board of registration in medicine promulgated regulations, effective July 24, 1987, establishing guidelines for a qualified patient care assessment program (QPCAP) to be implemented by hospitals. See 243 Code Mass. Regs. § 3.02 (1987). Incident reporting is one of the core components of the board's QPCAP regulations. See 243 Code Mass. Regs. §§ 3.07 and 3.08 (1987). Hospitals must establish internal procedures for reporting "injuries and incidents" to their patient care assessment coordinator in order to trigger the peer review process, 243 Code Mass. Regs. § 3.07 (3)(a), and a system for reporting "major incidents" directly to the board. 243 Code Mass. Regs. § 3.08. In addition, the regulations state that "information and records both *generated pursuant to* [the regulations] *and which relate to* the functions of a 'Medical Peer Review Committee' (as defined by M.G.L. c. 111, § 1), are . . . deemed confidential" (emphasis added). 243 Code Mass. Regs. § 3.04 (1) (1987). In 1987, this court upheld these incident reporting regulations in *Beth Israel Hosp. Ass'n* v. *Board of Registration in Medicine*, 401 Mass. 172, 177-178 (1987). Regarding both internal and "major" incident reporting we stated that "the board's determination that the . . . reporting required by the regulation is a *necessary* component of the

QPCAP . . . is reasonable" (emphasis added). *Id.* at 177. See *id.* at 178. The *Beth Israel Hosp. Ass'n* case then held that the board could not invade § 204 (*a*)'s privilege for "proceedings, reports and records" by requiring hospitals to permit the board to "access and audit" QPCAP information and records. See *id.* at 179-181 (limiting 243 Code Mass. Regs. § 3.07 [3][k]). The court noted, however, that:

> "Board access to all other information generated by the QPCAP system in no way would violate the PRC [peer review committee] privilege and is within the board's authority . . . . Thus, the hospitals should make available to the board all *incident reports*, patient complaints, employee training materials, credentialing items, Patient Care Assessment Coordinator reports, and other items they are charged with generating . . . . It is only where the board seeks PRC 'proceedings, reports and records' that § 204's PRC privilege stands in the way. Section 204 promotes the uninhibited expression of professional opinions before a PRC and protects the PRC's *work product*. Section 204 does not protect information gener- ated by other components of the QPCAP system or the 'raw materials' relied on by a PRC if obtained from other sources." (Emphasis added. Footnote omitted.)

*Id.* at 183. The court thus articulated clearly that G. L. c. 111, § 204, as it then stood, did not shield documents produced in the QPCAP system unless they were specifically related to or a product of a peer review committee. The *Beth Israel Hosp. Ass'n* case also cast doubt on whether risk management activi- ties conducted by a medical peer review committee would be protected by the privilege of § 204 (*a*), *id.* at 175 n.7, and whether a patient care assessment coordinator could designate that QPCAP documents fell within the privilege. *Id.* at 183 n.12.

Anticipating the problem of how best to protect QPCAP docu- ments and records that might fall outside the scope of the § 204 (*a*) privilege, for almost one year prior to this court's decision in *Beth Israel*, the Legislature had considered extending that privilege. Prior to *Beth Israel*, each proposed bill contained language that essentially tracked the board's regulations regard-

ing confidentiality.[5] 1987 Senate Doc. No. 2093, for example, submitted on November 12, 1987, provided that:

> "Information and records *generated pursuant to* risk management and quality assurance programs established by the board of registration in medicine *which also relate to the functions* of a medical peer review committee·shall be deemed to be proceedings, reports or records of a medical peer review committee for purposes of section two hundred and four of [c. 111] and may be so designated by the patient care assessment coordinator; provided, however, that such information and records so designated by the patient care assessment coordinator may be inspected, maintained and utilized by the board . . . . Such information and records inspected, maintained or utilized by the board . . . shall remain confidential and not subject to subpoena, discovery or introduction into evidence . . . ."[6] (Emphasis added.)

Only twenty-three days after the *Beth Israel* decision, however, the Governor signed St. 1987, c. 579, which contained amended language quite different from 1987 Senate Doc. No. 2093. As enacted, St. 1987, c. 579, created G. L. c. 111, § 205, stating that:

> "Information and records *which are necessary* to comply with risk management and quality assurance programs

---

[5]See 1987 House Doc. No. 2749, § 4; 1987 House Doc. No. 5654, § 4; 1987 House Doc. No. 5930, § 2.

[6]As the language of Senate Doc. No. 2093 shows, G. L. c. 111, § 205, grew out of the Legislature's concern that peer review information used by the board of registration in medicine would become subject to subpoena and discovery once out of the hands of a hospital's peer review committee. This is evidenced by the consistent effort made throughout the evolution of § 205 to protect peer review materials in the hands of the board. General Laws c. 111, § 205 (*b*), as enacted provides that "information and records so designated by the patient care assessment coordinator may be inspected, maintained and utilized by the board of registration in medicine . . . . Such information and records inspected, maintained or utilized by the board . . . shall remain confidential, and not subject to subpoena, discovery or introduction into evidence, consistent with section two hundred and four." G. L. c. 111, § 205 (*b*). This accords with our holding in *Beth Israel Hosp. Ass'n* v. *Board of Registration in Medicine,* 401 Mass. 172, 183 (1987), but goes further to clarify that documents in the hands of the board remain protected from discovery.

established by the board of registration in medicine and *which are necessary* to the *work product* of medical peer review committees, *including incident reports required to be furnished to the board of registration in medicine,* shall be deemed to be proceedings, reports or records of a medical peer review committee for purposes of [G. L. c. 111, § 204] and may be so designated by the patient care assessment coordinator . . . . In no event, however, shall . . . incident reports or records or information which are not necessary to comply with risk management and quality assurance programs established by the board of registration in medicine be deemed to be proceedings, reports or records of a medical peer review committee . . ." (emphasis added).

Section 205 (*b*) supplements § 204 (*a*) by statutorily designating certain "information and records" *not* obviously "of a medical peer review committee" (under the language of § 204 [*a*]) *as* "proceedings, reports or records" for the purposes of § 204 (*a*).

The final statute as enacted differs in five important ways from its immediate predecessor, 1987 Senate Doc. No. 2093. As these five amendments guide our interpretation of § 205, we set them out in detail. First, the Legislature changed the "generated pursuant to" and "also relate to" language of 1987 Senate Doc. No. 2093 to the "which are necessary" language of § 205 (*b*). This suggests that the Legislature intended to narrow the scope of the provision from what it, and the board's regulations, 243 Code Mass. Regs. § 3.04(1), had previously considered appropriate. This change tracked language used in our decision in *Beth Israel Hosp. Ass'n, supra* at 177-178 (stating that incident reporting is a "necessary component" of the board's peer review regulations). Second, the Legislature changed the second clause of the first sentence of § 205 (*b*) from related to the "functions" of a peer review committee to necessary to the "work product" of medical peer review committees. This change similarly borrowed language first applied to this context in our decision in *Beth Israel Hosp. Ass'n, supra* at 183 ("[s]ection 204 promotes the uninhibited expression of professional opinions before a PRC and protects the PRC's work product"). Third, the Legislature adopted the plural form "committees" in § 205 (*b*) ("necessary to the work product of medical peer

review *committees*") rather than maintaining the singular form it had previously employed in 1987 Senate Doc. No. 2093 and in the enacted provisions of § 204. See discussion, *infra*. Fourth, the Legislature inserted "including incident reports required to be furnished to the board of registration in medicine" as a specific example of records that are "necessary to" comply with risk management programs and necessary to the work product of peer review committees. G. L. c. 111, § 205 (*b*). Fifth, the Legislature added a new final sentence to § 205 (*b*) that had not existed in previous. drafts: "In no event . . . shall . . . *incident reports or records or information* which are not necessary to comply with risk management and quality assurance programs established by the [board] be deemed to be proceedings, reports or records of a medical peer review committee under this section . . ." (emphasis added). Unlike the first sentence of § 205 (*b*), which merely states that "*information and records*" which are necessary to those regulations are protected, this last clause inserts "*incident reports*" in addition to "information and records." This provision clarifies that the Legislature assumed that *some* incident reports generated by a hospital are *not* necessary to comply with the board's regulations.

### III

### A

We begin our analysis with the two general requirements of § 205 (*b*).[7] A party asserting a privilege under its provisions must produce evidence tending to show (1) that the information

---

[7]To assert the privilege of § 204 without reliance on § 205, a party would have to submit evidence showing that, under § 204 (*b*), the "documents, incident reports or records" sought were not merely "presented to [a] committee in·connection with its proceedings," G. L. c. 111, § 204 (*b*), but were, instead, *themselves* "proceedings, reports and records" of a peer review committee under § 204 (*a*). Although the motion judge below read § 204 (*b*) to require Deaconess to show that "the information [sought] is not otherwise available from independent sources," this was error. A party asserting the peer review privilege need not prove that the allegedly protected documents are unavailable elsewhere. Section 204 (*b*) merely states that "documents, incident reports or records" available from sources other than a committee itself may be subpoenaed from such sources, and that such discovery may not be avoided "merely because they were presented to" a peer review committee. G. L. c. 111, § 204 (*b*). See 243 Code Mass. Regs. § 3.04(4).

and records sought are "necessary to comply" with risk management and quality assurance programs established by the board,[8] and (2) that the information and records "are necessary to the work product" of "medical peer review committees." G. L. c. 111, § 205 (*b*).

We first ask whether incident reports are "necessary to comply with risk management and quality assurance programs established by the board of registration in medicine." G. L. c. 111, § 205. Two kinds of incident reports are mandated by the board's regulations: "required internal incident reports," which pertain to less serious incidents, 243 Code Mass. Regs. § 3.07 (3)(b), and "reportable major incidents," 243 Code Mass. Regs. § 3.08 (3).[9] The regulations define "Category I Major Incidents" as those involving maternal deaths related to delivery, fetal deaths, chronic vegetative state resulting from medical intervention, or death in the course of or resulting from ambulatory surgical care. 243 Code Mass. Regs. § 3.08 (2)(a). The regulations define "Category II Major Incidents" as "major or permanent impairments of bodily functions or deaths that are not ordinarily expected as foreseeable results of the patient's condition or of appropriately selected and administered treatment." 243 Code Mass. Regs. § 3.08 (2)(b).

In the *Beth Israel Hosp. Ass'n* case, we stated that 243 Code Mass. Regs. §§ 3.07 and 3.08 make required internal incident reports and major incident reports "a *necessary* component" of a risk management program. See *Beth Israel Hosp. Ass'n, supra* at 177-178. As a general proposition, "[t]he Legislature must be assumed to know the preexisting law and the decisions of this court." *Gillette Co.* v. *Commissioner of Revenue*, 425 Mass.

---

[8]Under G. L. c. 111, § 203 (*d*); G. L. c. 112, § 5; and St. 1986, c. 351, § 40, the board is charged with promulgating regulations relating to "risk management programs." In 1987, the board adopted regulations establishing a qualified patient care assessment program ("QPCAP"). See 243 Code Mass. Regs. §§ 3.00 et seq. (1987); *Beth Israel Hosp. Ass'n, supra* at 175. Under those regulations, health care providers must report "injuries and incidents" to a hospital's patient care assessment coordinator. See 243 Code Mass. Regs. § 3.07(3)(a).

[9]Required internal incident reports must be created within no more than twenty-four hours after an incident occurs, and can be triggered in one of two ways. First, they may be required by the "Focused Occurrence Reporting Criteria" under 243 Code Mass. Regs. § 3.07 (3)(b). Second, such a report may be required upon review of a patient's medical record at discharge, through an "Occurrence Screening" process mandated by the board under 243 Code Mass. Regs. § 3.07 (3)(c).

670, 677 (1997), quoting *Selectmen of Topsfield* v. *State Racing Comm'n*, 324 Mass. 309, 313 (1949). Here the inference that the Legislature was aware of the *Beth Israel Hosp. Ass'n* decision is strengthened by the fact that only weeks after the court's decision, the Legislature abandoned language that various versions of the proposed statute had incorporated for almost a year and adopted language used by this court.

We thus assume that *as to incident reports* the Legislature intended "necessary to comply with risk management and quality assurance programs established by the board of registration in medicine" to mean required by 243 Code Mass. Regs. § 3.07 or § 3.08.[10] We note, however, that the Legislature clearly contemplated that some incident reports will *not* meet this requirement; the final sentence to § 205 (*b*) specifically indicates that a class of incident reports exists that is *not* necessary to comply with the board's regulations and should *not* be protected. G. L. c. 111, § 205 (*b*).

We next turn to the second requirement of § 205 (*b*) that the records sought be "necessary to the work product" of a peer review committee. Carr asserts that we should read "necessary" in § 205 (*b*) narrowly to mean "of an inevitable nature, logically unavoidable, absolutely needed, or required." Under that definition, Carr claims that the incident reports in question are not "necessary" to a peer review committee's work because a committee could evaluate the incident in question based on oral testimony rather than the written reports. Deaconess argues that the reports *are* "necessary to the work product" of medical peer review committees because they trigger the work of such committees.

As Chief Justice Marshall held long ago, to read "necessary" to mean "absolutely indispensable" goes too far. See *McCulloch* v. *Maryland*, 17 U.S. (4 Wheat.) 316, 413-414 (1819) ("Does [necessary] always import an absolute physical necessity, so strong, that one thing, to which another may be termed necessary, cannot exist without that other? We think it does not . . . . A thing may be necessary, very necessary, absolutely or indispensably necessary. To no mind would the same idea be conveyed, by these several phrases"). Although perhaps a peer review committee could find alternative means of securing the

[10]There may, of course, be "information and records" that are necessary to comply with the board's regulations but are not found within 243 Code Mass. Regs. §§ 3.07 and 3.08.

information contained in incident reports, the Legislature's use of the word "necessary" does not require such a stringent showing as a condition of invoking the peer review privilege. The statutory and regulatory schemes as enacted mandate the creation of incident reports as an integral part of the peer review process. See G. L. c. 111, § 203 (*a*) (requiring "reporting" of substandard care incidents); 243 Code Mass. Regs. §§ 3.07 and 3.08 (requiring the creation and review of incident reports). Under the peer review system created by the Legislature, established by the board, and described by this court in the *Beth Israel Hosp. Ass'n* opinion, incident reports are a core component of peer review, they begin the peer review process, and they are necessary to a committee's work product.[11]

Moreover, in this provision of § 205 (*b*), the Legislature adopted the plural form "committees" rather than use the singular form as in other sections. We infer that the use of the plural "committees" expresses the Legislature's intent to relieve a defendant from showing that a particular record or report was submitted to and was used by a specific hospital committee. Instead, a hospital need only show that the information at issue is of a *type* that is generally used by such "committees."

Finally, we note that *some* incident reports are *expressly* privileged by § 205 (*b*)'s protection for "incident reports required to be furnished to the board of registration in medicine." G. L. c. 111, § 205 (*b*). Major incident reports fall squarely within this protection because "major incidents" *must* be reported directly to the board on a quarterly basis. See 243 Code Mass. Regs. § 3.08 (3) (stating, in relevant part, that "[h]ealth care facilities shall file major incident reports with the Board on a quarterly basis").[12] "Required internal incident reports," as opposed to a committee's own report of an incident

---

[11]There may, of course, be some incident reports that are *not* generally necessary to the work product of peer review committees, and thus fail to satisfy this requirement of § 205 (*b*). The hospital concedes that an "incident report" created by a security guard in this case but not by the hospital or one of its employees falls outside the scope of § 205 (*b*). See *Shotwell* v. *Winthrop Community Hosp.*, 26 Mass. App. Ct. 1014, 1015-1016 (1988) (describing an incident report regarding an accident involving a visitor, not a patient, on the hospital's premises). This does not alter the general proposition that incident reporting is necessary to the work product of peer review committees.

[12]We note that in some circumstances a hospital may be required to report incidents related to the denial of staff privileges to the board under G. L. c. 111, § 53B, and regulations related thereto. See 243 Code Mass. Regs.

to the board, do not squarely fit within this clause of § 205 (b). Although such reports *may* be included in a hospital's semi-annual "summary report" to the board at a hospital's discretion, 243 Code Mass. Regs. § 3.07 (3)(g), nowhere do the regulations *oblige* that required internal incident reports be filed with the board. Instead, semi-annual summary reports "shall contain recommendations for quality assurance, risk management, patient care assessment and education." 243 Code Mass. Regs. § 3.07 (3)(g). Although these summary reports must contain "[t]he number of Major Incident Reports filed," 243 Code Mass. Regs. § 3.12 (4)(d), the regulations are silent regarding the submission of "required internal incident reports" to the board.[13]

### B

Federal and State lower courts have split in their views of whether § 205 (b) permits in camera review. Compare *Hughes* v. *American Regent Lab.*, 144 F.R.D. 177, 178 (D. Mass. 1992) ("section 204 (a) bars a 'judicial proceeding' undertaken by this court involving a 'discovery' matter, i.e., *in camera* review, concerning records of a medical peer review committee"), with Nylen *vs.* John C. Dalton, Suffolk Superior Court No. 911808E (Feb. 22, 1994) (analogizing the medical peer review privilege to the attorney work product privilege, and permitting discovery if plaintiff can show "substantial need" and "undue hardship"). Our review of the case law in other States[14] convinces us that clear guidance is necessary to prevent lower courts from taking divergent approaches to this issue.

§ 3.08 (4). We do not reach the question whether such reports fall within the confines of G. L. c. 111, § 205 (b)'s explicit example of "incident reports required to be furnished to the Board of Registration in Medicine."

[13]Moreover, the regulations themselves suggest that "required internal incident reports" are for *internal* hospital use, not for submission to the board. By way of distinguishing major incident reports from required internal incident reports, the regulations state that "[t]he establishment by health care facilities of focused occurrence reporting and occurrence screening criteria is designed to facilitate the generation of *internal institutional incident reports* . . . . In addition, to permit the Board to conduct its own timely assessment of . . . major incidents . . . there is a necessity for reporting such major incidents directly to the Board . . . ." (Emphasis added.) 243 Code Mass. Regs. § 3.08 (1).

[14]Compare *Mennes* v. *South Chicago Community Hosp.*, 100 Ill. App. 3d 1029, 1032 (1981) (interpreting the Illinois peer review statute, Ill. Rev. Stat., ch. 51, par. 101 [1978], and holding that where a plaintiff sought information regarding the granting of hospital privileges to a defendant physician, "*in camera* inspection was unnecessary as the wording of the request to produce

Carr contends that §§ 204 and 205 pose no barrier to in camera review of incident reports or other hospital materials. Deaconess argues that §§ 204 and 205 create an absolute privilege that bars *any* disclosure, including in camera review. It urges the court to determine whether a document is privileged under § 204 by examining the *purpose* for and the *process* by which it was created, not the content that it contains. Deaconess claims that incident reports are not compiled in the regular course of business and are not part of a patient's regular medical record. Instead, Deaconess maintains that these reports are generated *solely* for the purposes of peer review, and that in camera review would be of no help to a judge in determining whether a given document is privileged under §§ 204 and 205.

Various courts of other States have recognized that in some circumstances a trial court has the authority to compel in camera review to determine whether documents are privileged under a peer review statute.[15] For example, in *State ex rel. Grandview Hosp. & Medical Ctr. v. Gorman,* 51 Ohio St. 3d 94, 95-96

itself sufficiently established that the material sought was protected by the statutory privilege"), with *Menoski v. Shih,* 242 Ill. App. 3d 117, 121 (1993) (holding that in camera review is warranted and noting that to hold otherwise would "leave the determination of whether a given document was required to be produced to the unfettered discretion of the party possessing it . . . . [S]uch a rule has obvious potential for abuse"). See also *Walker v. Alton Memorial Hosp. Ass'n,* 91 Ill. App. 3d 310, 313 (1981) ("the court must have an opportunity to acquaint itself with the nature of the material offered"). Similarly, contrast *Ray v. St. John's Health Care Corp.,* 582 N.E.2d 464, 474 (Ind. Ct. App. 1991) ("the trial court had a duty to dig behind the labels Hospital put on its documents and the conclusory statements contained in the [Hospital's] affidavit. The court should have conducted an *in camera* review on a document-by-document basis to determine whether the materials sought were protected by the peer review privilege"), with *Community Hosps. of Indianapolis, Inc. v. Medtronic, Inc.,* 594 N.E.2d 448, 452-453 (Ind. Ct. App. 1992) (holding that in camera review was not appropriate where hospital's affidavits showed a "process and structure" through which incident reports were submitted to peer review committee, and noting that Indiana peer review statute provides explicitly that "all communications to a peer review committee shall be privileged communications," Ind. Code § 34-4-12.6-2[a] [1995]).

[15]See, e.g., *Carolan v. Hill,* 553 N.W.2d 882, 887 (Iowa 1996) (permitting in camera review under Iowa's peer review statute, Iowa Code § 147.1[8]); *Memorial Hosp. - The Woodlands v. McCown,* 927 S.W.2d 1, 3, 12 (Tex. 1996); *Monty v. Warren Hosp. Corp.,* 422 Mich. 138, 145 (1985) (remanding to trial court for in camera review of documents alleged to be privileged under Mich. Comp. Laws § 333.20175[5]); *Lilly v. Turecki,* 112 A.D.2d 788, 789 (N.Y. 1985) (submitting records to medical malpractice panel for in camera review); *Saddleback Community Hosp. v. Superior Court,* 158 Cal. App. 3d

(1990) (per curiam) (permitting in camera review under Ohio's peer review statute, Ohio Rev. Code Ann. § 2305.251), the Supreme Court of Ohio held that in camera review was "only a minimal first step" in the discovery process with few negative consequences for the confidentiality afforded by Ohio's peer review statute. *Id.* at 96.

Although in camera review is a lesser intrusion on a hospital's confidentiality than full disclosure, we do not consider its effects "minimal." In camera review necessarily involves an invasion and dilution of a statutory privilege. Although the scope of civil discovery is broad, it is not unlimited. Rule 26 (b)(1) of the Massachusetts Rules of Civil Procedure, states in relevant part that "[p]arties may obtain discovery regarding any matter, *not privileged*, which is relevant to the subject matter involved in the pending action . . ." (emphasis added). 365 Mass. 773 (1974). Plaintiffs must not be permitted to disregard the policies embedded in the strong legislated protections of G. L. c. 111, §§ 204 and 205.[16] Although generally "[t]he conduct and scope of discovery is within the sound discretion of the judge," *Judge Rotenberg Educ. Ctr., Inc.* v. *Commissioner of the Dep't of Mental Retardation, (No. 1)*, 424 Mass. 430, 461-462 (1997), quoting *Solimene* v. *B. Grauel & Co., KG*, 399 Mass. 790, 799 (1987), a protective order that violates the provisions of a statutorily enacted privilege would be an abuse of discretion. A court "is not at

206, 209 (1984) ("[T]here must be an *in camera* hearing by the trial court, reviewing each item of evidence requested . . . ."). Many decisions incorporate or permit in camera review with little or no discussion of the matter. See *Toth* v. *Jensen*, 272 Ill. App. 3d 382, 386 (1993) (permitting in camera review of materials allegedly privileged under 735 Ill. Comp. Stat. Ann. 5/8-2101 et seq. [West 1992]); *Gauthreaux* v. *Frank*, 656 So. 2d 634, 634 (La. 1995) (same under La. Rev. Stat. § 13:3715.3), appeal after remand, 675 So. 2d 1061 (La. 1996); *Morse* v. *Gerity*, 520 F. Supp. 470, 471 (D. Conn. 1981) (same under Conn. Gen. Stat. § 38-19a).

[16]This is not a criminal case in which a defendant's constitutional right to confront witnesses compels that even strong statutory privileges be carefully overcome. See *Herridge* v. *Board of Registration in Medicine*, 420 Mass. 154, 157 (1995), *S.C.*, 424 Mass. 201 (1997) (holding that judge's refusal to order in camera review of psychiatric records in civil proceeding was not error, and stating that "[t]he petitioner relies on the principle applicable to criminal cases, 'that in certain circumstances, a defendant must have access to privileged records so as not to undermine confidence in the outcome of the trial.' . . . This principle, however, rests on Federal and State constitutional guarantees of due process that have application in criminal proceedings"). See *Commonwealth* v. *Two Juveniles*, 397 Mass. 261, 267 (1986).

liberty to substitute its judgment for that of the Legislature by expanding on a statutorily defined . . . privilege." *Petition of Catholic Charitable Bur. of the Archdiocese of Boston, Inc., to Dispense with Consent to Adoption*, 392 Mass. 738, 742 (1984). Cf. *Commonwealth* v. *Fuller*, 423 Mass. 216, 224 (1996) (noting that broad in camera review of rape counsellor records would constitute "an unwarranted judicial abridgment of a clearly stated legislative goal").

In the medical peer review context, in camera review must be turned to only as a last resort, not as the first step in the discovery process. Courts should first examine a discovery request to determine whether on its face it seeks information clearly within the scope of G. L. c. 111, §§ 204 and 205. Where interrogatories or the face of a motion to compel demonstrate that the records sought are within the scope of the statutory privilege, no in camera review should be granted. See *Mt. Diablo Hosp. Dist.* v. *Superior Court*, 183 Cal. App. 3d 30, 35 (1986) (holding that in camera review of the minutes of a protected committee's meeting was unnecessary); *Santa Rosa Memorial Hosp.* v. *Superior Court*, 174 Cal. App. 3d 711, 727 (1985) ("[c]ertain types of information are so clearly within the exclusive sphere of a protected medical staff committee — such as, for example, the . . . committee's self-generated analysis of the adequacy of work performed . . . — that [the statutory privilege of] section 1157 can be found applicable without extensive judicial inquiry"); Stephens *vs.* Coith, U.S. Dist. Ct. No. C-1-89-0104 (S.D. Ohio, Aug. 31, 1990) (no in camera review where face of a discovery request shows that the documents are protected).

If the face of a discovery request leaves doubt, the court should then consider the evidence proffered by the party asserting the privilege. Massachusetts Rule of Civil Procedure 26 (c), as amended, 423 Mass. 1401 (1996), requires that a party seeking a protective order make a showing of good cause for limiting the scope of discovery. See 8 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 2035, at 264-265 (1970). Where evidence of the way in which a given record was produced or how it was used demonstrates that the information sought is privileged, a court should refrain from in camera inspection, particularly if the party seeking the allegedly privileged materials offers no reason to doubt a hospital's sworn

statements.[17] See, e.g., *Arlington Memorial Hosp. Found.* v. *Barton*, 952 S.W.2d 927, 928-929 (Tex. Ct. App. 1997) (finding that where uncontroverted hospital affidavit tracked the language of the statutory requirements for medical peer review privilege, court should find privilege); *Community Hosps. of Indianapolis, Inc.* v. *Medtronic, Inc.*, 594 N.E.2d 448, 452-453 (Ind. Ct. App. 1992) (holding that in camera review was not appropriate where hospital's affidavits showed a "process and structure" through which incident reports were submitted to peer review committee); *Flannery* v. *Lin*, 176 Ill. App. 3d 652, 657-658 (1988) (where hospital's uncontroverted affidavit stated that report was submitted to a peer review committee, evidence was sufficient to find report privileged); *Gallagher* v. *Detroit-Macomb Hosp. Ass'n*, 171 Mich. App. 761, 769 (1988) (holding that "[i]n determining whether the information or record is privileged, the court should consider the hospital's bylaws, internal rules and regulations and . . . the committee's function"). Moreover, in this context, uncontradicted affidavits should be taken as true. See *A.R.* v. *C.R.*, 411 Mass. 570, 577 (1992); *Farley* v. *Sprague*, 374 Mass. 419, 425 (1978); *Flannery* v. *Lin, supra* at 658.

This accords with our decisions in other areas, where we have held that if in camera review serves no useful purpose, it should be avoided. See, e.g., *Bays* v. *Theran*, 418 Mass. 685, 693 (1994) (finding no error where a trial judge refused to conduct in camera proceedings to determine whether confidential attorney-client information had been revealed in a communication, and holding that the judge's inquiry into the "nature, topics, and extent of the communications" was sufficient where inquiry into the specifics of their content "would not have been helpful"); *Bougas* v. *Chief of Police of Lexington*, 371 Mass. 59, 65-66 (1976) (holding that in camera review of police records is unnecessary where oral testimony regarding the documents offered sufficient proof that they were of the type protected by statute).[18] See also *Commonwealth* v. *Collett*, 387

---

[17]This does not require a judge to trust blindly a hospital's submissions. A judge is free to order discovery into the *process* by which a given record or report was created to determine whether the information sought falls within the statutory privilege.

[18]See also *Puleio* v. *District Attorney for the E. Dist.*, 399 Mass. 1004, 1004 (1987) (noting that *Bougas* v. *Chief of Police of Lexington*, 371 Mass. 59 [1976], does not "stand[] for the proposition that in camera review is prohibited in disputes over the release of documents").

Mass. 424, 438-439 (1982) (noting that in camera review is warranted where "it is a practical necessity because the determination of whether the exception [for the psychotherapist privilege] applies can be made only when the content of the communication is disclosed"). Determining whether the medical peer review privilege applies turns on the way in which a document was created and the purpose for which it was used, not on its content. Examining that content in camera will therefore do little to aid a judge in applying §§ 204 and 205.

## C

On the facts presented, in camera review is not warranted in this case. Deaconess has produced sufficient evidence to show that the three incident reports in question meet the two requirements of § 205 (*b*).[19] Deaconess submitted four affidavits stating that incident reports generally are necessary to comply with the board's regulations, and one affidavit specifically swearing that the incident reports made in connection with the death of Howard were necessary in this sense. Although Deaconess could have submitted evidence showing more specifically that these incident reports are "required internal incident reports" under the board's regulations, 243 Code Mass. Regs. § 3.07, we take its submitted affidavit as true. Carr has provided no contradictory evidence to show that these three incident reports are *not* mandated by the board's regulations, and, given the severity of the incident in question and the broad scope of 243 Code Mass. Regs. § 3.07, it seems that the reporting here was "necessary to comply" with 243 Code Mass. Regs. §§ 3.01 et seq.[20]

---

[19]Deaconess has failed to show that the three incident reports in question are "incident reports required to be furnished to the board of registration in medicine" under that explicit example used in § 205 (*b*). Although surely Mr. Howard's death would be a "category II" major incident, which would trigger a major incident report filed with the board, none of the five affidavits Deaconess submitted to the motion judge averred as much. Although at oral argument Deaconess seemed to suggest that it, in fact, submits *all* incident reports to the board in its semi-annual reports, nowhere has the hospital shown that it is *required* to do so. At best, one affidavit states that, "if the incident or unusual occurrence is determined . . . to be reportable to the . . . Board of Registration in Medicine . . . a report is then filed in compliance with the appropriate rules and regulations." This is insufficient.

[20]As stated above, we do not hold that *all* incident reports are necessary to comply with the risk management and quality assurance programs established by the board. To so hold would do away with the final sentence of § 205 (*b*).

Second, the affidavits submitted by Deaconess state clearly that incident reports are necessary to the work product of the hospital's peer review committees. Such reports begin the peer review process and provide committees with the information needed to investigate and review incidents of sub-standard health care. They are the "foundation" of a committee's work. There had been a patient death in unusual circumstances and Carr's injury. The incident reports were the reports of persons whom the hospital, through its bylaws, reasonably considered would best be able to enlighten its peer review committee as to what actually happened. It is hard to imagine how the hospital could discharge its obligations under the board's regulations without undertaking just the kind of inquiry it directed here and which produced these reports. Although none of the hospital's affidavits specifically avers that these three reports were submitted to such a committee or were used in a committee proceeding, record or report, the hospital need not so prove. Instead, Deaconess only bears the burden of showing that the information it seeks to protect is necessary to peer review committee work product generally. It has done that.

## IV

Deaconess has successfully shown that the materials Carr seeks are privileged under G. L. c. 111, §§ 204 and 205.[21] The incident reports in question are necessary to comply with risk management programs of the board of registration in medicine and to the work product of medical peer review committees. There is no reason for in camera review of these documents; the affidavits submitted demonstrate that they are protected by the peer review privilege.

We recognize that the peer review privilege imposes some hardship on litigants seeking to discover information from hospital records, but the Legislature has clearly chosen to impose that burden on individual litigants in order to improve the medical peer review process generally. Moreover, the

---

[21]Carr argues that incident reports should not be privileged, because under the *Beth Israel Hosp. Ass'n* decision such privilege would preclude their use by the board. This is illogical. The legislative history of § 205 shows that it was enacted to permit use of these materials by the board without sacrificing the confidentiality provided by § 204. Moreover, § 205 (*b*) specifically grants the board access to such materials.

discovery burden is not unalleviated.[22] Carr admits that he has access to the names of those who wrote the incident reports at issue, and that he is free to depose those authors in the regular course of discovery about their firsthand knowledge of the events that allegedly led to the death of Howard and the injury of Carr. See *Hughes* v. *American Regent Lab.*, 144 F.R.D. 177, 179 (D. Mass. 1992) (noting that a litigant barred by G. L. c. 111, § 204, can engage in other forms of discovery to elicit needed information).

A judgment should be entered in the county court stating that the order of the Superior Court judge is vacated and that the matter is remanded for further proceedings in accordance with this opinion.

*So ordered.*

---

[22]Sections 204 and 205 contain various exceptions for special instances that warrant access to committee materials. See, e.g., G. L. c. 111, § 204 (*b*) (permitting use of proceedings, reports, findings and records of a peer review committee in an action under G. L. c. 231, § 85N, against a member of a committee for engaging committee duties in bad faith).