Roach, Christine M., J.
This case is one of several before the Worcester Superior Court, pending in various sessions and at various stages of litigation, involving the same tragic and undisputed set of facts. *
In February 2002, multiple organs were harvested from a donor cadaver at UMass Memorial Medical Center, Inc. (UMass Medical). The donor died from metastatic glioblastoma multiforme, that is, a brain cancer that had metastacized to other parts of his body. Plaintiffs decedent in this case, Mr. Skirvin, received a kidney transplant at UMass Medical from the donor cadaver on February 4, 2002. He was first notified by UMass Medical of the donor’s disease on February 15, 2002, after the defendants were informed that cancer cells had been discovered (by a third-party facility not involved in this case) in lung tissue harvested from the donor. Mr. Skirvin declined the immediately-offered nephrectomy, until July 9, 2002, when he consented to and received the procedure. Mr. Skirvin’s course thereafter, until his death April 6, 2003, was medically complex. However it is undisputed that no tumors or other indicia of cancer were discovered at his autopsy.
Plaintiff originally sued many defendants for wrongful death by reason of medical negligence. The New England Organ Bank (the Bank) and two of its donation coordinators were among them. However, the Bank and its nurses were dismissed from this case pursuant to a stipulation of dismissal with prejudice in June 2007. Docket at Paper 56.
In March of this year Plaintiff served a subpoena on the Bank and its Medical Director. As reflected in the pleadings before the court, the subpoena sought computer records referencing, inter alia, Mr. Skirvin, the donor, the disease, and harvesting or transplant procedures performed during the week of February 2, 2002. The Bank produced certain responsive documents, but declined to produce email discussion among the Bank and recipient surgeons of the lung tissue discovery and its implications. UMass Medical timely asserted its “peer review” privilege, pursuant to G.L.c. Ill, sections 204-205. Following appropriate Rule 9C procedures, Plaintiff moved to compel. Pursuant to anon-evidentiary hearing June 23, 2009, and at the request of all parties,[1] the court has conducted an in camera review of the withheld documents. For the reasons stated here, Plaintiffs Motion to Compel is ALLOWED in part and DENIED in part.
Legal Standard
The statute provides that “the proceedings, report and records of a medical review committee, shall not be subject to subpoena or discovery.” A medical peer review committee is defined as a committee “of a state or local professional society of health care providers or a medical staff of a hospital which committee has as its function the evaluation or improvement of the quality of health care rendered by providers of healthcare services.” G.L.c. Ill, section 1. “Health care providers” includes doctors, registered nurses, and licensed hospitals. Id. The privilege, where it applies, is not subject to waiver. Ayash v. Dana-Farber Cancer Institute, 443 Mass. 367, 397 n.28 (2005) (“[AJpplying waiver principles to peer review communications would significantly undermine the effectiveness of the statute”). This privilege “does not rest on *238 the threshold confidentiality as between the parties to the litigation . . . but instead is designed to foster a candid exchange of information regarding the quality of medical care.” Miller v. Milton Hospital & Medical Center, Inc., 54 Mass.App.Ct. 495, 501 (2002). Under certain circumstances, the statute may apply when proceedings of the committee include consulting with individuals outside the institution. Grande v. Lahey Clinic Hosp., Inc., 49 Mass.App.Ct. 77 (2000).
Formal participation in or submission to a peer review meeting or other proceeding is not required. Carr v. Howard, 426 Mass. 514, 532 (1998). Because peer review protection “turns on the way in which a document was created and the purpose for which it was used, not its content,” the protection may apply without a committee actually convening. Swartz v. Cartwright, 15 Mass. L. Rptr. 261, *6 (Mass.Super. 2002) (Curley, J.), citing Carr, 426 Mass, at 531. To successfully invoke the privilege, UMass Medical bears the burden of demonstrating that the information it seeks to protect is necessary to peer review committee work product generally. In re Deposition of Harrington Memorial Hospital, 17 Mass. L. Rptr 294, *2 (Mass.Super. 2003) (Page, J.), citing Carr, 426 Mass. at 532. The existence of a claimed privilege is a question of fact for a trial judge. Miller v. Milton Hosp. & Med’l Ctr., Inc., 54 Mass.App.Ct. 495, 498-99 (2002).
The Documents
Pursuant to the agreed-upon procedure at the hearing, the Bank on June 29, 2009 produced a package of documents for the court’s in camera review, consisting of forty-five (45) pages. Twelve (12) of those pages represent excerpts from a review paper submitted to the publication Transplantation Reviews and entitled “Donor Related Malignancies,” authored by Doctors Kauffman, McBride, Cherikh, Spain, Hanto, and Delmonico. The excerpts are undated. From other references in the emails I infer this article was in draft form at the time.
The vast majorily of the remaining pages contain an email string — among Dr. Delmonico on behalf of the Bank, involved transplant surgeons, and certain other physicians with experience in the field — discussing the donor, his disease, the discovery of the infected nodes in the lung tissue, and the treatment implications.[2] The string begins on February 13, 2002, with notice by Dr. Delmonico to surgeons who received the organs. The last such transmission is dated February 25, 2002. All of these communications were among physicians only, although the emails contain some data from another organ registry.
Findings and Rulings
I find that the twelve pages of review article excerpts — even if in draft form at the time — in no way implicate the protections of the peer review statute and are discoverable. I therefore ALLOW Plaintiff s Motion to Compel with respect to these twelve pages of review article material.
I find that many of the remaining email communications include information in the nature of an incident report. That is, the emails begin with the Bank’s informing the accepting and transplanting physicians of the discovery with respect to the lung tissue. The subsequent emails respond to, question, or comment upon that discovery, and its implications for transplant patients — both the particular patients receiving organs from this donor, and transplant procedure generally. But it is by now black letter law that not all incident reports meet the requirements of the statute, that is, are both necessary to comply with risk management and assurance programs, and necessary to the work product of a peer review committee. Carr, 426 Mass, at 523-24, and 531, n.20. Pursuant to the statute, incident reports available from sources other than a peer review committee itself may be subpoenaed from such sources, and not avoided merely because they may have been presented to a peer review committee. Carr, 426 Mass, at 522, n.7; citing G.L.c. Ill, section 204(b), and 243 Code Mass. Regs. Section 3.04(4).
I also find that much of this communication is “peer review” in only the purely colloquial sense of that term, that is, physicians commenting upon and explaining their own judgment and decision-making in patient care to one another, while simultaneously seeking comment from other experienced physicians. This is an interactive process that responsible and collegial professionals undertake all the time. The statutory language and its interpretation by our appellate courts make clear that the privilege does not apply to everyday, colloquial communications, but only to the very specific context of an institution’s formal review of its physician’s care.
There is no claim or evidence in the record before me, by way of affidavit or any other source, that UMass Medical undertook a peer review process for any of its physicians in connection with this organ harvest and transplant. Nor is there any evidence before me that contemporaneous communications among collaborating physicians such as these would be, or were, sought to be used in any such process — either specifically or generally.[3] Thus there is no evidence before me that UMass Medical deems any of these communications the sort of “required internal incident reports,” or “reportable major incidents” necessary to comply with risk management and quality assurance programs. Carr, 426 Mass, at 523-24; Beth Israel Hospital Ass’n v. Board of Registration in Medicine, 401 Mass. 172, 177-78 (1987).
There is simply argument by counsel who, understandably, has not had the opportunity to review the materials in the form collected here[4] — that it is “within the realm of possibility” that such communications “may reflect the proceedings of a medical peer review committee.” I find these materials do not so reflect. I find that the context in which the communications *239 were created and the purpose for which they were used was to puzzle through a real-time risk occurring in the transplant community, and not to anticipate, prepare, or gather information that might be used for peer review. I therefore find no Massachusetts authority which would bring the bulk of these emails into the penumbra of statutory peer review protection.
In Grande the court held that a written report submitted to a hospital’s sitting peer review committee, created by an outside consultant retained by that committee to review and assess the patient charts of a physician, was protected by peer review. That is not a surprising result, and I find those facts quite distinct from the facts before me. And, while formal participation in such a process is not required to protect materials, Carr, 426 Mass, at 532,1 nonetheless conclude, based on the state of the interpretive law in Massachusetts, that some threshold showing of a formal structure and the potential for such a proceeding — actual or contemplated by institutional policy — is required. Absent that, I cannot and do not find UMass Medical has met its burden to show or persuade that these materials are necessary to its peer review committee work, and thus to the statutory purpose “to promote uninhibited investigation and expression of opinion in peer review proceedings,” Grande, 49 Mass.App.Ct. at 79, citing Carr, 426 Mass. at 518, even in general terms. See also, Harrington Memorial Hospital, at *2.

I therefore ALLOW Plaintiff’s Motion to Compel with respect to these thirty (30) pages of email

I find two pages of the submitted material to be an exception to the above analysis. The materials contain, at the very end, what appears to be a stand-alone email dated April 8, 2002, with the “RE:” line of “UMass Donation Committee Meeting.” This email addresses the circumstances surrounding the harvesting of the donor organs at UMass Medical. Based on my review of these two pages, I find this communication was prepared in the context of, and in connection with, review by the UMass Medical committee then responsible for transplant donation care. I therefore rule these two pages fall within the statutory protection as interpreted by Ayash, Carr, Beth Israel Miller, Grande, and our own Superior Court precedent.

Accordingly, Plaintiffs Motion to Compel is DENIED with respect to these two pages of April 8, 2002 email

Production of the compelled materials shall occur within ten days of receipt of this Order, WITH THE EXCEPTION THAT ANY IDENTIFIABLE PATIENT INFORMATION CONTAINED IN THESE MATERIALS WHICH HAS NOTALREADYBEEN DISCLOSED IN THIS PROCEEDING, PURSUANT TO RELEASE OR AGREEMENT, SHALL BE REDACTED prior to production.

Editor’s Note: For an earlier opinion in this matter see 25 Mass. L. Rptr. 57 (Tucker, Richard T., J.) (physician may be liable for negligently harvesting and distributing a cancerous body part from an anatomical donor, even though there is no physician/patient relationship with the plaintiff).

The court is aware of the disinclination to conduct such a review, Carr v. Howard, 426 Mass. 527-30 (1998), but on these somewhat unusual facts agrees with the parties that it must see the documents in context, and not rely on necessarily circumscribed descriptions.

These emails contain the following “Re” or subject lines: “Metastatic Glioblastoma”; “donor with brain malignancy that was metastatic”: “Donor-Glioblastoma”; or “the donor with glio.”

Nor do I find evidence the Bank was conducting a peer review of its own provision of services at the time of these communications. Plaintiff argues the Bank is not protected by the statute, and the Bank concedes as much.

I do not presume UMass Medical has never seen these materials in any form. To the contrary, I infer it is entirely possible UMass Medical’s own physicians retained copies of these email exchanges retrievable from in-house computer servers.