Doerfer, J.
Plaintiffs, who allege medical negligence and wrongful death on the part of defendants, are seeking discovery of written comments about plaintiffs care made by Harvard Community Health Plan doctors. Defendants assert the material is privileged. For the reasons stated below, plaintiffs motion is denied.
BACKGROUND
Plaintiff Paul D. Peters, individually and as executor of the estate of his late wife, Joanne M. Peters, alleges that his wife died at age 43 due to the medical negligence of the defendants. He claims that defendants failed to diagnose his wife’s breast cancer in a timely manner and mismanaged her care, thus resulting in her death.
Prior to her death, Ms. Peters submitted a medical complaint form to the Harvard Community Health Plan administration. This form was passed on to two HCHP physicians who were then involved in Ms. Peters’s care but who are not defendants in this action. One doctor from whom comments were requested, Dr. Tishler, became Ms. Peters’s treating oncologist after the cancer was diagnosed; the other, Dr. O’Shea, *562 became her primary care physician after defendant Dr. Ling left HCHP. After receiving the complaint form, Dr. O’Shea made extensive comments regarding Ms. Peters’s care; Dr. Tishler declined to comment, citing her role as Ms. Peters’s care provider.
Plaintiff seeks production of the handwritten notes of both doctors. Defendant contends these notes are privileged under Massachusetts’s “medical peer review privilege” as defined at G.L.c. 111 §205(b) and 243 CMR 313(2). Plaintiff contends that since the notes have not specifically been used in the context of a peer review committee proceeding, they are not covered by the privilege.
A review of the statutes and regulations leads this court to conclude that even though a medical peer review committee was not convened as a result of Ms. Peters’s complaint, the comments generated by the complaint did constitute peer review and thus are the type of material considered by the legislature to be necessary to a peer review committee proceeding. For that reason, further outlined below, plaintiffs motion is denied.
DISCUSSION
G.L.c. 111 §203(a) requires that “the by-laws of every licensed hospital and the by-laws of all medical staffs shall contain provisions for reporting conduct by a health care provider that indicates incompetency in his specially or conduct that might be inconsistent with or harmful to good patient care or safety.” Section 111(b) discusses procedures to follow when review of such conduct occurs by a “medical peer committee.”
Section 204(a), enacted in 1986, provides that “the proceedings, reports and records of a medical peer review committee shall be confidential and shall not be subject to subpoena or discovery, or be introduced into evidence, in any judicial or administrative proceeding” with exceptions here not relevant.
A year after the enaction of Section 204(a), the legislature added Section 205. Section 205(b) provides that “information and records which are necessary to comply with risk management and quality assurance programs established by the board of registration in medicine and which are necessary to the work product of medical peer review committees, including incident reports required to be furnished to the board of registration in medicine, shall be deemed to be proceedings, reports or records of a medical peer review committee for purposes of section two hundred and four of this chapter . . .” (Emphasis added.)
243 CMR 300 et seq. outlines the review procedures called for by G.L.c. 111 §203. Part 3.02 defines medical peer review committee," consistently with G.L.c. 111 §1. as
a committee ... of a medical staff of a licensed hospital, nursing home, or other health care facility, provided the medical staff operates pursuant to written by-laws that have been approved by the governing board of the hospital, nursing home, or other health care facility, which committee has as its function the evaluation or improvement of the quality of health care rendered by providers of health care services, the determination whether health care services were performed in compliance with the applicable standards of care ... the determination of whether a health care provider’s actions call into question such health care provider’s fitness to provide health care services . . .
243 CMR 3.04(1) provides that
to promote free and full compliance with the reporting requirements set forth below, which will enhance the protection of the public, information and records both generated pursuant to 243 CMR 3.00 and which relate to the functions of a “Medical Peer Review Committee” (as defined by M.G.L.c. 111 §1) are hereby deemed confidential and, to the extent allowable under M.G.L.c. 111 §204, not subject to subpoena, discovery, or introduction into evidence.
243 CMR 3.13(2) provides that an “HMO’s Qualified Patient Care Assessment Program may function as a system of ‘peer review’ ...” 243 CMR 3.13(2)(b) includes “(s)ystems to identify, analyze and resolve patient grievances” as within the scope of a Qualified Patient Care Assessment Program.
The threshold issue here is one of statutory construction. Section 205(b) provides that “information and records which are necessary to comply with risk management and qualify assurance programs established by the board of registration in medicine and which are necessary to the work product of medical peer review committees . . .” are privileged. (Emphasis added.) Defendant, in her Supplemental Memorandum in Opposition to Plaintiffs Emergency Motion to Compel Production of Documents, p. 6, paraphrases this phrase disjunctively, thereby asserting that the above emphasized phrase actually means “or which are necessary to the work or peer review committees.” However, the Massachusetts Superior Court, Middle-sex County, in an opinion by Justice Julian Houston, interpreted the phrase conjunctively. Pantazis v. Silen, Sup. Ct. Civil Action No. 90-4302-C, p. 4-5. The same approach to the phrase was taken by Justice James McHugh in Nicastro v. Robbins, Sup. Ct. Civil Action No. 88-6374, p. 10-11.
These two decisions, as well as the language of the statute, militate toward a conjunctive reading of this phrase. As Justice McHugh states in Nicastro, any records falling under Section 205(b) “must display two characteristics, i.e., they must be necessary ‘to comply with risk management and quality assurance programs’ and they must be necessary ‘to the work product of medical peer review committees.’ ” Id. at 10.
It is clear that the doctors’ written comments in the instant case satisfy the first criterion, that of being necessary to compliance with risk management and qualify assurance programs. The second — and piv *563 otal — issue is whether the doctors’ written comments in the instant case are necessary to the work product of a medical review committee.
It is clear the legislature sought to create a broad privilege for documents relating to the peer review process. The language in the statutes and regulations is sweeping, and its stated objective is to increase the scope of the peer review privilege in order to promote candor in the medical review process.
243 CMR 3.01, defining the scope and purpose of the regulatory scheme, states that “to assure free self-examination by physicians and institutions, the legislature provided extensive safeguards of confidentiality, immunity and privilege for both internal reviews and reports to the Board. It is the explicit intent of 243 CMR 300 that such safeguards be strengthened to the extent permitted by law.”
The Supreme Judicial Court, in Beth Israel Hospital Association v. Board of Registration in Medicine, 401 Mass. 172, 182 (1987), in denying the Board of Medicine access to peer review committee proceedings, reports and records, noted that the peer review committee privilege “was designed to foster aggressive critiquing of medical care by the provider’s peers.”
Portions of the regulations indicate that the peer review privilege was intended to extend beyond de jure committee proceedings. 243 CMR 3.13(2) provides that an “HMO’s Qualified Patient Care Assessment Program may function as a system of‘peer review’...” 243 CMR 3.13(2)(b) includes “(s)ystems to identify, analyze and resolve patient grievances” as within the scope of a Qualified Patient Care Assessment Program. Thus, the language of the regulations appears to place patient complaint systems such as those followed in the instant case within the definition of peer review, and thus within the scope of the privilege.
The Pantazis decision, however, seems to take a more narrow view of the statutory scheme. There, plaintiffs former doctor observed the deterioration of her former patient under the care of the defendant, and subsequently wrote a letter to the president of Beth Israel Hospital about the case. The former doctor, at a deposition, was instructed by her counsel not to answer questions about the letter or conversations about the letter. Deponent’s counsel contended the writings and conversations were privileged as precipitants for medical peer review committee action.
In determining that the privilege did not apply, the court noted that “no (medical peer review committee) was ever convened,” Pantazis at 5, and that “nothing ... indicates that there was ever any intention to bring Dr. Silen’s management of the case to a peer review committee.” Id. at 7.
In the instant case, the Ludden affidavit describes a process which, if it had been followed, would clearly bring any materials used in that process within the statutory privilege. The process described involves a Complaint Committee and a Patient Care Assessment Committee, both of which engage in processes of peer review as defined by statute. This is the type of process envisioned by applicable statutes and regulations. Ludden Aff., p. 3.
The processes followed in the case of the writings in question, however, were different. Peters’s complaint was given to administrator Ann Kelly, who gave it to Drs. Tishler and O’Shea for their analysis. The Deposition of Margaret Byrnes, p. 96, Line 6 through Page 101, Line 3, describes a process followed pursuant to an informal protocol, rather than an established peer review process. No committee was formed. The record does not appear to answer the question whether the process described in the Ludden affidavit, p. 10, was ever brought to bear on Peters’s complaint.
Ultimately, however, the inquiry must be into whether the materials in question were the product of peer review. If so, they are clearly are “necessary to the work product of medical peer review committees” as required by G.L.c. 111 §205(b) and “relate to the functions of a medical peer review committee” as required by 243 CMR 304(1).
Since the comments in the instant case were made pursuant to a patient grievance system as defined in 243 CMR 3.13(2)(b), and since activities conducted pursuant to that regulation are defined as potentially involving peer review at 243 CMR 313(2), the materials do fall under the regulations’ definition of a peer review process.
Further, it is apparent that the essence of the comments was peer review. All Dr. O’Shea did was report on existing records — he did not perform any additional investigation. His comments constitute an assessment of the patient care provided to Ms. Peters. This brings the comments squarely within 243 CMR 304(1), which states that “information and records ... which relate to the functions of a medical peer review committee .. . are hereby deemed confidential and . .. not subject to ... discovery.” The function of a medical peer review committee, as defined at G.L.c. 111 §1, includes “the determination of whether health care services were performed in compliance with the applicable standards of care.” Given that O’Shea's comments constituted an evaluation of HCHP’s treatment of Ms. Peters, these comments clearly “relate” to the evaluative activity of a medical peer review committee.
The dispositive question is thus not whether a committee was formed. Even though the materials have apparently not yet entered HCHP’s “official” peer review stream as defined in the Ludden Affidavit, the materials were the product of a peer review process. The materials thus fall within the broad peer review privilege envisioned by the legislature.
While some language of the Pantazis case suggests a narrower reading of the privilege than that adopted here, that case is also distinguishable on its facts. *564 There, the physician who criticized her colleague did so on her own volition, rather than as part of any defined review process. Here, the comments of Drs. Tishler and O’Shea were solicited by the hospital administration. This, much more so than in Pantazis, gives their comments the flavor of an official review process.
The comments of the Pantazis deponent are more akin to “whistleblowing” than peer review. The process that led to the comments in the instant case was institutionally initiated. The process of peer review itself is inherently institutional, and it is clear the legislature sought to increase institutional candor by making such processes privileged.
It is true that the principal goal of HCHP Member Relations Coordinator Ann Kelly in circulating the Peters complaint was to respond to that complaint, rather them to review the actions of the treating physicians. Indeed, Kelly’s memorandum to Dr. Tishler seeking comment states that “(y)our input and comments will assist us in responding to the member.” At some level, the workings of a process with such a purpose seem far removed indeed from the proceedings of a medical peer review committee.
But while the principal purpose of circulating the complaint may have been patient relations, it is also clear that peer review did occur here. Two doctors were asked by the HCHP administration to comment on the performance of their colleagues. Such administration-initiated commentary falls within the scope of medical peer review as defined by the legislature. There is nothing in Dr. O’Shea’s comments indicating he thought they were for solely for the benefit of the patient; the scope of the comments goes well beyond the purpose of HCHP member relations.
The opinions of Dr. O’Shea were voiced within the context of a privileged process. It is far from clear, however, that his interpretations of Peters’s case are not discoverable in a manner that does not invade this privilege. Dr. O’Shea could presumably be deposed. Further, the extent to which his eventual role as Peters primary care physician informed his comments is not clear; presumably, a similar critique of Peters’s care could be attained through expert testimony.
For the above reasons, plaintiffs motion is denied.
ORDER
For the reasons set forth above, it is hereby ORDERED that plaintiffs emergency motion to compel production of documents is DENIED.