Curley, J.
In January another judge denied the defendant’s motion to quash the plaintiffs’ subpoena for hospital and medical records in the possession of the Nantucket Cottage Hospital (“the Hospital") per *262 taining to the administrator’s decedent, David B. Voorhees, M.D. (“Dr. Voorhees”). When, following that judge’s decision, the Hospital did not produce the records, the plaintiffs moved to compel. Because the Hospital based its refusal to produce the documents concerning Dr. Voorhees's performance as a physician on peer review grounds, see G.L.c. Ill, §205(b), and because it did not have the opportunity to be heard when the judge made his decision in January, I held a hearing on the motion to compel. Further, because the Appeals Court decided Miller v. Milton Hospital and Medical Center. Inc., 54 Mass.App.Ct. 495 (2002), after the motion papers were filed, I allowed the filing of post-hearing briefs so that the parties could address the relevant issues in light of that decision. The matter is now ripe for resolution.[1]

The Records at Issue

Two sets of records are at issue: the Hospital’s medical records concerning Dr. Voorhees’s care and treatment as a patient, and the Hospital’s administrative records concerning Dr. Voorhees’s performance as a physician. The defendant focuses primarily on the records concerning Dr. Voorhees’s care and treatment, while the Hospital focuses primarily on the administrative records concerning Dr. Voorhees’s performance as a physician.
Dr. Voorhees’s Medical Records
I agree with plaintiffs’ arguments that G.L.c. Ill, §70E is not a blanket prohibition against disclosure of medical records but rather limits disclosure “to the extent permitted by law,” so that Pressman v. Brigham Medical Foundation, Inc., 919 F.Sup. 516 (D.Mass. 1996), is inapposite. Of course, the confidentiality accorded medical records should not be easily overcome, but, e.g., the rules of civil procedure, including Mass.R.Civ.P. 26, provide adequate protection against unwarranted rummaging through medical records. Here, given the deposition testimony of Dr. Voorhees’s nurse, Gloria Gasnarez, who worked for Dr. Voorhees full-time from 1993 “until. . . 1997 or eight”, that Dr. Voorhees demonstrated ”[m]ore frequent hand shaking” in "the last year that [she] was there,” and because the operation at issue occurred on March 14, 1997, the plaintiffs’ request to examine Dr. Voorhees’s medical records is "reasonably calculated to lead to the discovery of admissible evidence.” Ms. Gasnarez’s testimony suggests that Dr. Voorhees’s physical condition may have affected his performance as a physician, and it is reasonable to suppose that his medical records would illuminate that issue.
An initial limitation on the production of Dr. Voorhees’s medical records is called for, however. It seems to me reasonable to permit plaintiffs to examine Dr. Voorhees’s medical records from approximately one year before the operation to approximately one year after the operation. This balances the plaintiffs’ demonstrated entitlement to explore issues surrounding Dr. Voorhees’s medical condition with his legitimate confidentiality interests as a patient. If this discovery provides a basis for further production of medical records, plaintiffs may file the appropriate motion.
Accordingly, the motion to compel the production of Dr. Voorhees’s medical records from the Hospital is ALLOWED, limited to the period from March 1, 1996 through and including March 1, 1998. The records are to be produced within twenty business days of Hospital counsel’s receipt of this order.

The Hospital’s Records Concerning Dr. Voorhees's Performance as a Physician

In its opposition to the plaintiffs’ motion to compel, the Hospital argued that ”[t]he credentialing file” of Dr. Voorhees maintained by the Hospital is “privileged, immune from subpoena or discovery, and confidential pursuant to the ‘peer review’ provisions” of G.L.c. Ill, §§203-205 and the Board of Registration in Medicine’s regulations, 243 CMR 3.00-3.05.
For purposes of this case, and as defined in G.L.c. Ill, §1, a “medical peer review committee” is
a committee of a . . . medical staff of a . . . licensed hospital . . . provided the medical staff operates pursuant to written by-laws that have been approved by the governing board of the hospital . . . which committee has as its function the evaluation or improvement of the quality of health care rendered by providers of health care services, the determination whether health care services were performed in compliance with the applicable standards of care, determination [sic] whether the cost of the health care services rendered was considered reasonable by the providers of health care services in the area, the determination of whether a health provider’s actions calls into question such health care provider’s fitness to provide health care services, or the evaluation and assistance of health care providers impaired or allegedly impaired by reason of alcohol, drugs, physical disability, mental instability or otherwise . . .
See also Miller, 54 Mass.App.Ct. at 499-500 (citation omitted).
The Hospital relies on G.L.c. 111, §204(a), which states in relevant part that
. . . the proceedings, reports and records of a medical peer review committee shall be confidential and . . . shall not be subject to subpoena or discovery, or introduced into evidence, in any judicial or administrative proceeding . . .
G.L.c. Ill, §205(b) further states that
Information and records which are necessary to comply with risk management and quality assurance programs established by the board of registration in medicine and which are necessary to the work product of medical peer review committees, including incident reports required to be furnished to the board of registration in medicine or any *263 information collected or compiled by a physician credentialing verification service operated by a society or organization of medical professionals for the purpose of providing credentialing information to health care entities shall be deemed to be proceedings, reports or records of a medical peer review committee for purposes of section two hundred and four of this chapter and may be so designated by the patient care assessment coordinator . . .
The Hospital also relies on 243 CMR 3.00-3.05, and specifically cites 243 CMR 3.01:
The Board of Registration in Medicine, in promulgating 243 CMR 3.00, has as its primary goal, ensuring that patients in both institutional and office setting receive optimal care. Accordingly, 243 CMR 3.00 is intended to assist the physicians and health care institutions of the Commonwealth in their efforts to identify problems in practice before they occur and to put in place preventive measures designed to minimize or eliminate substandard practice. This enhancement of patient care assessment will be accomplished through the strengthening and formalizing of programs of credentialing, quality assurance, utilization review, risk management and peer review in institutions and by assuring that these functions are thoroughly integrated and overseen by the institutions’ corporate and physician leadership ... To assure free self-examination by physicians and institutions, the legislature provided extensive safeguards of confidentiality, immunity, and privilege for both internal reviews and reports to the Board. It is the explicit intent of 243 CMR 3.00 that such safeguards be strengthened and extended to the extent permitted by law.
Opposition of Non-Party Nantucket Cottage Hospital to Plaintiff Frederick Swartz’s Motion for an Order to Compel Production of Records at 3-4 (emphasis as in the Opposition).
Further, the Hospital states, 243 CMR 3.04(2) provides in relevant part that “(t]o protect the confidentiality of information . . . and to assure that this information and these records are not subject to subpoena, discovery, or introduction into evidence, the Patient Care Assessment Coordinator may designate such information and records as proceedings, reports and records of a medical peer review committee, within the meaning of M.G.L.c. 111, section 204(a).”
Finally, the Hospital has presented its by-laws (the “By-laws”), and in particular has pointed out Article VII, Section VI, entitled “Qualified Patient Care Assessment Program.” That portion of the By-laws states in relevant part that:
a. The establishment of the elements of a Qualified Patient Care Assessment Program pursuant to 243 CMR 3.07, paragraph three, are hereby authorized.
c. To protect the confidentiality of information and records both generated pursuant to 243 CMR 3.00 and which also relate to the functions of a “Medical peer [sic] Review Committee” (as defined by M.G.L.c. Ill, s. 1) and to assure that this information and these records are not subject to subpoena, discovery of [sic] introduction into evidence, the Medical Staff Executive Committee, which is the hospital’s duly appointed Patient Care Assessment Committee/Coordinator, designates such information and records as “proceedings, reports and records of a medical peer review committee,” within the meaning of M.G.L.c. 111, §204(a).
As suggested by the headings to its arguments, the Hospital’s essential position is that Dr. Voorhees’s credentialing file, and documents relating to the Hospital’s “credentialing activities” concerning Dr. Voorhees, are protected by the peer review privilege created by G.L.c. 111, §§203-205. The Hospital makes this argument without identifying, as to any particular document, how that document was created or that document’s role in the peer review process. Instead, it seems, it is the location of the document, i.e., its presence in the “credentialing file” rather than the manner in which it was compiled or how it was used, that shields the document — indeed, all of the documents — from discovery.[2]
I start with certain general considerations. First, ”[a]s the party asserting the privilege, the [Hospital has] the burden to establish that it applies.” Miller, 54 Mass.App.Ct. at 499 (citation omitted). “In the medical peer review context, the court must first determine whether the records for which the privilege is claimed are on their face such as clearly fall within the privilege ... If the question is in doubt on the face of the materials, the court should then consider the evidence proffered by the party asserting the privilege.” Id. (citations omitted). “A party asserting a privilege under [G.L.c. Ill, §205(b)] must produce evidence tending to show (1) that the information and records sought are ‘necessary to comply’ with risk management and quality assurance programs established by the [Board of Registration in Medicine] and (2) that the information and records ‘are necessary to the work product’ of‘medical peer review committees.’ ” Carr v. Howard, 426 Mass. 514, 522-23 (1998) (footnote and citations omitted). “A court ‘is not at liberty to substitute its judgment for that of the Legislature by expanding on a statutorily defined . . . privilege.’ ” Id. at 528-29 (quoted case omitted). More broadly, “[tlestimonial privileges ‘are exceptions to the general duty imposed on all people to testify.’ Such privileges diminish the evidence before the court and contravene the fundamental principle that ‘the public . . . has a right to every man’s evidence.’ As such, they must be strictly construed and accepted ‘only to the very limited extent that permitting a refusal to testify or *264 excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.’ ” Three Juveniles v. Commonwealth, 390 Mass. 357, 359-60 (1983), cert. denied, 465 U.S. 1068 (1984) (quoted cases omitted)). This principle applies whether a court is asked to create a privilege, as in, e.g., Three Juveniles, or is construing a statutory privilege, see Commonwealth v. Pare, 43 Mass.App.Ct. 566, 571 (1997), aff’d., 427 Mass. 427 (1998) (”[t]he (Commonwealth v. Bishop, 416 Mass. 169 (1993)] protocols have not altered the traditional recognition that testimonial privileges, which have the effect of inhibiting full disclosure of the truth, are exceptional and to be strictly construed”).[3]
In making my decision, I credit the uncontradicted averments in the affidavit of Lucille Giddings, the Hospital’s President and CEO (the “Affidavit”), to the extent that she is competent to make those averments. See Carr, 426 Mass. at 530 (“. . . in this context, uncontradicted affidavits should be taken as true”) (citations omitted). Giddings’s averments include that “(a]ll of the information contained within [Dr. Voorhees’s credentialing file] was obtained during the investigation of Dr. Vorhees'[4] credentials, following his initial application, and subsequent reapplications, for privileges at [the Hospital].” Affidavit at ¶6. The next averment seems somewhat inconsistent with its predecessor, which referred to "all of the information” in the credentialing file: “[i]n addition, the file contains information about the Hospital’s ongoing assessment, evaluation, monitoring and re-evaluation of the credentials, qualifications, and fitness to practice medicine of Dr. Vorhees. The file also contains information relating to action taken by the Hospital to verify and establish Dr. Vorhees’s qualifications and fitness to practice medicine.” Id. (emphasis added). I credit Ms. Giddings’s further averments that “the information obtained was necessary to comply with risk management and quality assurance programs required as a condition of licensure by the board of registration in medicine,” id., §17, but I do not credit her averment, that ”[t]he investigation, and information obtained, were necessary to the work product of the various Hospital’s [sic] efforts to investigate, assess, monitor, re-evaluate, and take action if appropriate, with respect to the physicians holding privileges to practice medicine at [the Hospital].”[5] Id., ¶8.
Giddings’s affidavit satisfies that portion of G.L.c. Ill, §205(b) which protects from disclosure “information and records which are necessary to comply with risk management and quality assurance programs established by the board of registration in medicine . . .” But more is required. The Hospital must also establish that the “information and records” that it seeks to protect are necessary to the work product of medical peer review committees . . ." G.L.c. Ill, §205(b) is phrased in the conjunctive, and our appellate courts have interpreted the statute in accordance with its plain language, i.e., for the information and records to be protected they must be “necessary to comply with risk management and quality assurance programs” and “necessary to the work product of medical peer review committees.” E.g., Carr, 426 Mass. at 522-23. Based on the record, and notwithstanding the averments in Ms. Giddings’s affidavit that I credit, I conclude that the Hospital has not carried its burden to establish that the information and records that it claims are privileged are “necessary to the work product of medical peer review committees.”
To begin with, the Hospital has a “committee of ... a medical staff of a . . . licensed hospital . . . [operating] pursuant to written by-laws that have been approved by the governing board of the hospital .. . which committee has as its function the evaluation or improvement of the quality of health care rendered by the providers of health care services . . . the determination of whether a health care provider’s actions call into question such health care provider’s fitness to provide health care services, or the evaluation and assistance of health care providers impaired or allegedly impaired by reason of alcohol, drugs, physical disability, mental instability or otherwise . . .” That committee, as to credentialing, is the Hospital’s “Executive Committee.” By-Laws, Article VII(c)( 13). To join the Hospital’s Medical Staff, one must meet the qualifications set forth in Article III, Section II of the By-Laws. While the Board of Trustees decides who joins, or stays, on staff, it does so “only after there has been a recommendation from the Medical Staff,” By-Laws, Article III, Section 111(a), which in turn is based on the Executive Committee’s credentialing investigation. Id.; see also Article VII, Section (c)( 13). Staff appointments are for two years (a one-year provisional membership applies for initial appointments). Id. Article III, Section 111(a) and (b). An applicant must allow the Hospital to make a thorough investigation of all aspects of the applicant’s “competence, character, and ethical qualifications,” Article III, Section IV(c), and the procedures for appointment and reappointment are set out in writing. Id., Section V.
The Executive Committee’s credentialing work, therefore, is the work of a medical peer review committee: it is a committee of the Hospital, operating pursuant to written by-laws adopted by the governing board of the hospital, which has as its function the evaluation or improvement of the quality of health care rendered by the providers of health care services. The Executive Committee is charged with reviewing the “competence, character, and ethical qualifications" of those who apply, or re-apply for privileges, i.e., staff membership. I do not see a reason to distinguish *265 between a medical peer review committee’s investigation of a physician’s actions in a single incident or its examining the whole of his “competence, character, and ethical qualifications,” even if that may go beyond the physician’s technical proficiency. Nor, contrary to plaintiffs’ argument in their “Supplemental Memorandum in Support of Plaintiffs [sic] Motion for an Order to Compel Production of Records,” at 3 (“[djespite being given a chance to dó so, [the Hospital] has not filed any supplemental affidavit of Lucille Giddings, or anyone else, indicating that Dr. Voorhees was the subject of peer review or of any disciplinary action set forth” in the By-Laws) is it necessary that peer review meetings take place for the information to be protected. See Carr, 426 Mass. at 532 (“[a]lthough none of the hospital’s affidavits specifically avers that [the reports at issue] were submitted to [a peer review] Committee or were used in a [peer review] committee proceeding, record or report, the hospital need not so prove. Instead, [the hospital] only bears the burden of showing that the information it seeks to protect is necessary to peer review work product generally. It has done that”); Peters v. Ling, No. 920413F (Superior Court, September 1, 1994, 2 Mass. L. Rptr. 561, 1994 WL 879535), slip op. at 4 (Doerfer, J.) (“[t]he dispositive question is thus not whether a [peer review] committee was formed. Even though the materials have apparently not yet entered [the record holder’s] ‘official’ peer review stream as defined . . . the materials were the product of a peer review process. The materials thus fall within the broad peer review privilege envisioned by the legislature”).
Fundamentally, it seems that it is information gathering, analysis, and the results of the medical peer review process that G.L.c. 111, §204(a) protects.[6] See Beth Israel Hospital Association v. Board of Registration in Medicine, 401 Mass. 172, 182 (1987) (the peer review privilege is “designed to foster aggressive critiquing of medical care by the provider’s peers”); Swatch v. Treat, 41 Mass.App.Ct. 559, 563 (1996) (“[p]eer review committees have a profound interest in the sanctity and protection of the confidentiality under which they operate. The ability of committee members to speak with candor and the willingness of persons called before them to be equally forthright would be seriously hampered by public release of proceedings or reports of the peer review body” (citations omitted)). That information gathering process may occur without a medical peer review committee actually convening. For example, a doctor may resign after a peer review process starts, he may die, or he may relinquish his privileges before the end of the re-appointment process; but the information gathered or analyzed to further those medical peer review functions would still be privileged. See Carr, 428 Mass. at 531 (“[djetermining whether the medical peer review privilege applies turns on the way in which a document was created and the purpose for which it was used, not on its content”); Miller, 54 Mass.App.Ct. at 499 (“[s]pecifically, where a privilege is claimed under G.L.c. 111, §204, the principal focus of the inquiry is on whether the document was created by, for or otherwise as a result of a ‘medical peer review committee’ ”). Here, however, no competent evidence in Giddings’s affidavit or elsewhere supports the conclusion that any document in question was “necessary to the work product of [a] medical peer review committee.”
At least implicitly, the Hospital seeks recognition of a “credentialing privilege” by which all information bearing on a physician’s performance would be protected under the peer review privilege by virtue of that information being in the “credentialing file.” This privilege would apply not only when a credentialing committee scrutinized a physician initially, but also, as Giddings’s affidavit makes plain, throughout the “various Hospital’s efforts to investigate, assess, monitor, re-evaluate, and take action if appropriate, with respect to the physicians holding privileges to practice medicine at [the] Hospital].” This describes a “rolling” process, beginning with the initial application for privileges and continuing until the physician retires, resigns, dies, or is refused privileges. And, given that the Executive Committee is charged with examining the “competence, character, and ethical qualifications” of a physician applying or re-applying for privileges, the information relevant to its determination would be broad indeed. In essence, under the Hospital’s argument, information or records bearing on any aspect of a physician’s professional conduct, and some aspects of the physician’s personal life (i.e., those relevant to his “character” and “ethical qualifications”) that made its way into his “credentialing file" would be shielded from discovery because that information is relevant to credentialing.[7] Apart from the breadth of this assertion, it also ignores that statute’s direction that “[d]ocuments, incident reports or records otherwise available from original sources shall not be immune from . . . discovery . . . merely because they were presented to such a medical [peer review] committee in connection with its proceedings.” G.L.c. 111, §204(b). Moreover, while in G.L.c. 111, §205(b) the Legislature specifically recognized the important role of credentialing, it did not create the broad “credentialing privilege” that the Hospital’s argument envisions. Had the Legislature intended to create such a “credentialing privilege,” it could have done so in simple, direct language. But it did not. All of these factors, it seems to me, undermine the Hospital’s arguments that the documents in Dr. Voorhees’s credentialing file, regardless of what documents are in it or how they came to be there, and regardless of the role they play in credentialing are protected by the medical peer review privilege.[8]
*266 Accordingly, I find and rule that, even accepting as true the averments in the Giddings affidavit that she is competent to make, the Hospital has not carried its burden of showing that its entire “credentialing file” is protected by the medical peer review committee privilege, and the Hospital has not even attempted to make a separate showing as to any particular document. In short, nothing in the Hospital’s papers demonstrates, as to all of the documents at issue, or as to any particular document, that it was “necessary to the work product of a medical peer review” committee, or that it was “created by, for or otherwise as a result of a ‘medical peer review committee.’ ” Miller, 54 Mass.App.Ct. at 499.[9] Compare, e.g., Carr, 426 Mass. at 516; Hughes v. American Recent Laboratories, 144 F.R.D. 177, 178 (D.Mass. 1992).
The plaintiffs’ motion to compel is therefore ALLOWED, and the Hospital is to produce the documents sought within twenty business days of Hospital counsel’s receipt of this order.[10]

The judge’s January decision demonstrates that he considered the peer review issue at that time. Nonetheless, I decided that the Hospital should be given the opportunity to be heard, because, at least in some respects, it is as interested in this issue as the defendant. Moreover, because I allowed argument on the motion to compel, I allowed argument on the production of Dr. Voorhees's medical records as well, although that did not implicate any peer review issues, and did not as directly involve the Hospital.

The Hospital’s “Privilege Log re Credentialing Materials” segregates the documents into five categories. But those headings, one of which refers to “materials obtained and/or generated by” the Hospital, three of which refer to “correspondence” between the Hospital and the Board of Registration in Medicine, Dr. Voorhees, and Dr. Voorhees’s insurer, and one which is labeled “miscellaneous” are too general to assist me in making the determinations required here. See also n.7, infra.

In affirming the Appeals Court’s decision in Pare, the Supreme Judicial Court stated that it “agree[d] with the result reached by the Appeals Court and substantially with the reasoning in its opinion.” Commonwealth v. Pare, 427 Mass. 427, 428 (1998).

Plaintiffs, the defendant, and one newspaper article submitted in connection with this motion use the spelling “Voorhees.” The Hospital uses the spelling “Vorhees.”

I assume that the sentence was intended to read “necessary to the work product of the Hospital’s various efforts to investigate . . ."or “necessary to the various Hospital committee’s efforts to investigate ...” But “various” efforts do not equate to “medical peer review committee” efforts. Moreover, it does not appear that Giddings is a member of the Executive Committee, which according to the Hospital’s ByLaws serves as its Credentials Committee, By-Laws, Article VII(c)(13), although as Hospital President she “shall be routinely invited to attend” as a Hospital representative, unless she is specifically excluded. By-Laws, Article VII(a) and (b). I doubt that a non-physician, non-member of the credentials committee is competent to state what is “necessary” for that committee’s work, i.e., its evaluation of aphysician: Giddings is not a physician’s “peer” in evaluating that physician’s professional conduct nor is she a member of the committee itself. This is so however one defines “necessary.” Carr, 426 Mass. at 524. While the plaintiffs have not contested Giddings’s averments, the By-Laws were produced only after the hearing on the motion to compel, as part of the Hospital’s post-hearing brief. I do not think that I must therefore accept those averments as true, especially where the source of any “contradiction” is the text of the By-Laws.

The Board of Registration of Medicine regulations do not, and cannot, expand the protections provided by the statutory peer review privilege. 243 CMR 3.00 states that its “explicit intent” is to “strengthen! ] and extend! ]” the “safeguards" provided physicians and hospitals in their self-examination procedures “to the extent permitted by law.” 243 CMR 3.01 refers to the “formalizing of programs of credentialing, quality assurance, utilization review, risk management and peer review . . .” (emphasis added). This suggests that these regulations do not equate “credentialing” with “peer review or that "credentialing" is subsumed within “peer review.” Rather, this portion of the regulation seems to assume that a formal program of “credentialing” is distinct from a formal program of “peer review.”

So far as I can tell, the phrase “peer review” does not appear in Gidding’s affidavit. That is by no means dispositive; but that Giddings has not averred, despite two opportunities to do so, that any or all of the documents were "created by, for, or as a result of a medical peer review committee, or were ’’necessary to the work product of a medical peer review" committee, is noteworthy. In fact, the headings on the “Privilege Log re Credentialing Materials” refer to, e.g., correspondence to or from the Hospital, not to or from a medical peer review committee. Nor has the Hospital stated that the correspondence was sent by the Hospital on behalf of a medical peer review committee, or to a medical peer review committee in care of the Hospital.

Accepting the Hospital’s argument that the peer review privilege should encompass Dr. Voorhees’s "credentialing file” would create a privilege for documents from as early as April 9, 1992 (Dr. Voorhees's clinical privileges application) to at least May 12, 1998 (letter from Giddings to the Board of Registration in Medicine).

I am mindful of Miller’s admonition that where “the applicability of the privilege is less than clear from the facts, or where the record permits multiple alternative determinations of facts bearing on the privilege questions, findings by the trial judge of subsidiary facts supporting the determinations would assist appellate review.” Id. 54 Mass.App.Ct. at 501 (citation omitted). Here, however, the Hospital has had two opportunities (three, if the defendant’s initial objection to production on peer review grounds is considered) to present facts supporting its invocation of the privilege. The Hospital's latest opportunity not only followed Miller but also a hearing at which, as I recall, I specifically raised the question of the adequacy of the Giddings affidavit to show that the documents were generated “by, for, or otherwise as a result of a medical peer review committee. I then provided the Hospital the opportunity to respond to those issues. If the Hospital has not met its burden despite these opportunities to do so, a further hearing seems unnecessary, and, in candor, borders on being overly solicitous towards one party in this dispute.

I admit to some unease in this result. Some of the documents at issue may be protected by the peer review privilege, because, as I have construed the privilege, it extends to at least some aspects of credentialing. But the Hospital bears the burden of presenting sufficient competent evidence to establish that some or all of the documents are so protected. The competent portions of Giddings’s affidavit and the “Privilege Log re Credentialing Materials” are insufficient for this purpose and I ought not to employ speculation, guesswork, or assumptions in making my decision.